**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES K. COLLINS, M.D. | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. H-20-1897 |
| | § | |
| D. R. HORTON-TEXAS, LTD. | § | |
| Defendant. | § | |

**COLLINS' POST HEARING BRIEF**

It is undisputed by any court that the Sieberman owners, now JAMES COLLINS (COLLINS) as predecessor in interest, were not joined or noticed in the federal case no. 666 in this court that resulted in their land be taken. Thus, this district court MUST vacate the 1944 judgment because it void as to COLLINS' Sieberman land.

D R HORTON-TEXAS, LTD. (HORTON) does not dispute that the Frederick Sieberman Survey, A-497, patent title owners, now JAMES COLLINS (COLLINS) as predecessor in title with perfected privity, were never noticed or joined in the federal diversity suit cause number 666 in this United States Court of the Southern District of Texas. Absence of personal jurisdiction renders the 1944 judgment void as to the Sieberman Survey owners, that to date is still a current existing patented survey in the Texas General Land Office (GLO) with wherein no mutuality of title or conflict of survey has ever existed. It is undisputed that the GLO was never a witness or a party in federal case no. 666 where HORTON's predecessors sought to extinguish the GLO's certified, patented, exclusive and non-conflicted Sieberman land survey in federal court. It is undisputed that HORTON's only basis for title is was the void 1944 federal judgment. The State court had no jurisdiction to vacate the fedeal judgment under federal Rule 60(b), so *res judicata* does not prevent this federal court now from properly vacating as the only court with the

jurisdictin.   Curiously, the State court expressly admits it did not try COLLINS' proper trespass

to try title claim, which is the only basis for determining title in Texas.   COLLINS has admitted to

this court evidence of his successful merit to his Sieberman title.   It is uncontroverted that

COLLINS' has standing as a privy in title, the State court was not a court of competent jurisdiction

to vacate under Rule 60, the State court never tried trespass to try title or vacatur on the merits,

and non-joinder is an exception to *res judicata.*   This court should grant COLLINS'

reconsideration.

Case law argued last week in this court to support reconsideration of this court's original

dismissal on *res judicata* is referenced below to aid this court as promised.   A copy of the transcript

of such hearing is attached. Exhibit A (Doc. 33 with certified transcript).   Interestly, HORTON did

not and has responded with any case law or argument contrary to the case law cited by COLLINS

in the clerk's record, court reporter's record or herein below.

1.      **JUDGMENTS WITHOUT JOINDER ARE <u>VOID</u> AND <u>MUST</u> BE SET-ASIDE.**

a.      **"A judgment entered without notice or service is constitutionally infirm."** *Peralta v. Heights Medical Center,* 45 U.S. 80, 84 (1988).

b.      **"If the court has no jurisdiction over the person of the defendant... and, consequently, no authority to pass upon his personal rights and obligations**; if the whole proceeding, without service upon him or his appearance, is *coran non judice* and void... If the judgment be previously void, it will not become valid by the subsequent discovery of property of the defendant, or by his subsequent acquisition of it. **The judgment, if void when rendered, will always remain void."** *Pennoyer v. Neff*, 95 U.S. 714, 732 (1877).

c.      "Independent actions must, if Fed. R. Civ. P. 60(b) is to be interpreted as a coherent whole, be reserved for those cases of injustices which, in certain instances, <u>are deemed sufficiently gross to demand a departure from rigid adherence to the doctrine of *res judicata.*</u> Under the rule, an independent action should be available only to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 39 (1978).   A grave miscarriage of justice includes a person's property be taken when that person was not joined in a suit to defend his land.   *See*, e.g., *Marshall v. Holmes,* 141 U.S. 589 (1891) (where a judgment was taken against a party in an underlying action as a result of a forged document).

d.      "This circuit has held that a district court *must* set aside a default judgment as void if it determines that it lacked personal jurisdiction over the defendant because of defective service of process. *See, e.g., Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988)." *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 393 (5th Cir. 2001).

**2.      STATE COURT NOT COMPETENT TO VACATE FEDERAL JUDGMENT. NO VACATUR ACTION IS OR WAS EVER AVAILABLE IN STATE COURT. UNDER RULE 60(B), VACATUR <u>MUST</u> BE FILED IN THE ORIGINAL DISTRICT COURT. NO *RES JUDICATA*.**

a.      **"The Rule 60(b) motion for relief from final judgment <u>must</u> be filed in the district court and in the action in which the original judgment was entered.** No independent jurisdictional ground is necessary because the motion is considered ancillary to or a continuation of the original suit.**"** *Bankers Mortg. v. United States*, 423 F. 2d 73, 78 (5th Cir. 1970).

b.      **"A [Rule 60(b)] motion to vacate or an equity action seeking to set aside a verdict <u>may</u> <u>only</u> be heard in the court whose judgment is being challenged."** *Wilson v. C.I.R.*, 309 Fed. Appx. 829, 833 (5th Cir. 2009).

c.      "There are well-recognized procedural and common law doctrines that allow the presiding court to set aside a verdict and allow a new trial. *See Weisman v. Charles E. Smith Management, Inc.*, 829 F.2d 511, 513 (4th Cir. 1987)** (discussing three methods by which a party may seek to vacate a verdict, all of which <u>must</u> be addressed by the court in which the action occurred.)...** "'[T]he proper forum in which to assert that a party has perpetrated a fraud on the court' is the court which allegedly was a victim of that fraud.'" *Chewning v. Ford Motor Co.*, 35 F. Supp. 2d 487, 491 (1998).

d.      "The proper court in which to raise the allegation that a judgment was obtained by fraud, misrepresentation or other misconduct normally is the district court. It is obvious that a motion under Fed. R. Civ. P. 60b[] or an independent action in equity should be filed in the district court. Furthermore, **the proper forum in which to assert that a party has perpetrated a "fraud on the court<u>" is the court which allegedly was a victim of that fraud.</u>** *Universal Oil Prods. Co. v. Root Refining Co*., 328 U.S. 575, 580-81 (1946); *Hazel-Atlas Co*. v. *Hartford-Empire Co*., 322 U.S. 238 (1944); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2870 at 249-50 (1973 and Supp. 1987)." *Weisman v. Charles E. Smith Mgmt., Inc*. 829 F.2d 511, 514 (4th Cir. 1987).

e.      "'[T]**he proper forum** in which to assert that a party has perpetrated a fraud on the court' **is the court which allegedly was a victim of that fraud**.'" *Wilson v. C.I.R.*, 309 Fed. Appx. 829, 833 (5th Cir. 2009), citing *Chewning v. Ford Motor*

*Co.*, 35 F. Supp. 2d 487, 491 (D.S.C. 1998*), Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580-81, 66 S. Ct. 1176, 90 L. Ed. 1447 (1946), and *Weisman v. Charles E. Smith Mgmt., Inc.* 819, F.2d 511, 514 (4th Cir. 1987)." *Brown v. Bilek*, 2009 U.S. Dist. LEXIS 73770, *29-30 (5th Cir. 2009), opinion by the Honorable Melinda Harmon.

f.  "... **the action of nullity must be brought in the same court which rendered the judgment."** *Barrow v. Hunton,* 99 U.S. 80, 84 (1878).

g.  "[The Supreme Court holds] a <u>suit to void a judgment</u> because of a procedural error or misapplication of the law **must be brought in the same court that rendered the judgment** because it is a continuation of the underlying suit. *Wuxi Taihu Tractor Co. v. York Group, Inc.*, 766 F. Supp. 2d 803, 806 (5th Cir. 2011), opinion by the Honorable Lynn N. Hughes.

## 3.  TEXAS GENERAL LAND OFFICE (GLO) SURVEY IS CONCLUSIVE AND BASIS FOR ALL TEXAS LAND PATENTS AND LAND SURVEYS OVER PRIVATE SURVEYS UNCORROBORATED BY WITNESS MARKS AND WITHOUT DEFENSE OF PATENT OWNERS

Black's Law Dictionary defines a Survey as "The process of which a parcel of land is measured and its boundaries and contents ascertained; also a map, plat or statement of the result of such survey, with the courses and distances and the quantity of the land." Black's Law Dictionary, 1445 (6th ed. 1990). The GLO land surveys

a.  *Ney v. Mumme,* 17 S.W. 407, 408 (Tex. 1886), *emphasis added*:

Our constitution and statutes require that every patent emanating from the state shall be recorded in a book to be kept for that purpose in the general land office. These records are not kept for the purpose of giving notice of the issuance of the patent, but to preserve evidence of the transactions of the department. The original patent is delivered to the grantee for his own protection, and he may use it as evidence of title. *But the records of the land office stand in the same position, and have equal dignity and the same effect. McGarrahan Mining Company*, 96 U.S., 319. They satisfy the state that its title to the land has passed to the patentee. They are the only evidence to which the state looks to ascertain this fact. When produced by the grantee, they are conclusive against the state government upon the question as to the issue of the patent. *If conclusive against the state, they are conclusive against any person; for, if the state cannot deny its own act, no one else has the right to do so for it.*

b.  *United States v. Throckmorton,* 98 U.S. 61 (1978), *emphasis added*:

**The Circuit Court of the United States has now no original jurisdiction to**

reform surveys made by *the land department* [e.g., GLO] of confirmed Mexican grants...

The object of [this case] is to have a decree of the court, setting aside and declaring to be null and void a confirmation of the claim of W. A. Richardson under a Mexican grant, to certain lands, made by the board of commissioners of private land-claims in California... The general ground on which this relief is asked is... fraud... [the United States] attempting to negative the idea that juridical possession of the land was ever delivered to Richardson by the Mexican authorities...

The bill in this case is filed May 13, 1876, more than twenty years after the rendition of the decree which it seeks to annul. *During that time Richardson, the claimant, and the man who is personally charged with the guilt of the fraud, has died; his heirs, who with himself were claimants in the suit, are not made parties, and the land has passed from his ownership to that of the present defendants by purchase and conveyance...*

Where [a party] has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side, -- these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing.

Thus, the GLO Sieberman Survey patent and field land survey are conclusive to all entities as to the issue of the patent and the field notes supporting the original survey. The GLO's Sieberman patent should not be denied or extinguished by a district court, let alone by one applying an incorrect standard as did Surveyor Boyle the 1944 federal suit. See Exhibit B (Doc. 35 James Collins' Affidavit filed Feb. 5, 2021, which includes the GLO certified records and survey plats). Boyle did not apply known witness marks of the original Mexican Hodge Survey as expressed in the 1947 appeal brought by the Hodge owners (because the Sieberman owners were never joined or noticed of the trial or the judgment):

"Boyles [Hodge party surveyor] had located the lines of the James Hodge league by certain witness marks on the ground. *None of these witness marks were*

> *originally placed by Wightman [the original county survey for the GLO established patent] but they were accepted by everyone [at the trial except the necessary parties the Sieberman owners who would have EMPHATICALLY contested this fraud had they been joined] as the true boundaries of the James Hodge Survey.* Atkinson [another Hodge surveyor but one who contested Boyles findings] never made a complete survey of the James Hodge Survey, but he claimed that Boyles had misplaced the James Hodge Survey because Atkinson *had located one of the original Wightman witness marks at the Northwest corner of the survey.*"

*McComb v. McCormack,* 159 F.2d 219, 226 (5th Cir. 1947). The Mexican government granted James Hodge one league, 4,428.40 acres, as expressly delineated by the metes and bounds description in the GLO James Hodge patent file filed notes. The Boyle survey enlarged the Hodge Survey by 1,321.60 acres, all derived from land within the GLO Sieberman Survey patent. The Hodge Survey corners per the Boyle Survey in no way comport with the adjoining Sieberman Survey but the other adjoining survyes, including the Archibald Hodge Survey to the east. See attached affidavit, Exhibit B, showing the calculations using the GLO patent records and current plats.

The law of real property is uniquely a creature of state law. *Severance v. Patterson,* 370 S.W.3d 705, 713 (Tex. 2009). It is an issue of federalism and local control, and both Texas and federal courts recognize the primacy of state law and sources in determining matters of real property title. *See id.; Phillips Petrol. Co. v. Mississippi,* 484 U.S. 469, 484, 108 S. Ct. 791 (1988). Texas courts have consistently held that when finding the lines of a survey, "[t]he cardinal rule is that the footsteps of the original surveyor… should be followed." *T.H. Investments, Inc. v. Kirby Inland Marine, L.P.,* 218 S.W.3d 173, 207 (Tex. App.—Houston [14[th] Dist.] 2007, pet. denied**).** *"Stare decisis* is never stronger than in protecting land titles, as to which there is great virtue in certainty." *Id.* at 173.

The public policy of Texas, as announced in repeated decisions, demands the sanctity of land titles emanating from the state, and, where ancient boundary lines have been recognized for

long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them. *Blaffer v. State,* 31 S.W.2d 172, 191 (Tex. 1930). The 1944 federal court judgment did not rely upon the original witness marks to determine the boundaries of the Hodge Survey. Indeed, it is indisputable that the federal court did not apply state law, because the *McComb* opinion shows the federal court ignored the state law and original witness marks. *McComb v. McCormack,* 159 F.2d, at 226.

Ignoring Texas rules of construction to ascertain boundaries, the 1944 federal court did not rely upon the original witness marks certified in the GLO's files to determine the boundaries of the Hodge Survey. *McComb,* 159 F.2d, at 226. Nor did the federal court review or rely upon the footsteps or witness marks for the Sieberman Survey certified in the GLO files. *Id.* Below see the July 2016 GLO Montgomery County plat showing the existential Sieberman and one-league Hodge Surveys are mutually exclusive.





The Sieberman Survey patent is conclusive against the state government as to the issue of the patent.  "If the state cannot deny its own act, no one else has the right to do so for it."  *Ney v. Mumme,* 17 S.W. 407, 408 (Tex. 1886).  Thus, the GLO's patent should not be denied or extinguished by a district court, let alone by one applying an incorrect standard.

**4.  COLLINS IS A PRIVEY WITH STANDING TO VACATE UNDER RULE 60(B) AS AS SUCCESSOR IN TITLE INTEREST OF THE SIEBERMAN LAND**

a.    **"Privity with a party provides a valid basis for standing under Rule 60(b)**, 7 Moore, Federal Practice 226-227 (and cases cited at p. 227, n. 33) (2d ed. 1966)... Privity between persons denotes the relationship arising out of mutual rights or successive rights in the same property or interest... *Acheson v. Albert*, 90 U.S.App.D.C. 294, 195 F.2d 573 (1952); 72 C.J.S. Privity; Privies; Privy, pp. 954-962 (1951)." *Mobay Chem. Co. v. Hudson Foam Plastics Corp.*, 277 F. Supp. 413, 416-417 (S.D.N.Y 1967).

b.    "The court held that the city school board had sufficient standing under Rule 60(b) [though not a party to the original action] to bring a motion to amend the outstanding decree, because it was a **"successor in interest to a party to the original decree."** *Wright v. County School Bd. of Greensville County, Virginia,* 309 F. Supp. 671, 678 (E.D. Va 1970), *rev'd,* 442 F.2d 570 (4th Cir. 1971), *rev'd,* 407 U.S. 451 (1972).

c.      The United States Supreme Court determined standing existed through privity as a successor in real property title interest under a Rule 60(b) claim. "In 1979, the Federal Government brought an action in the United States District Court for the Southern District of Mississippi to quiet title in certain tracts of lands--which had been part of the territory encompassed by the Louisiana Purchase of 1803--in the belief that the supposed owners [**including Carl Beggerly who was a successor in title interest to the original 1781 Spanish patent**] lacked clear title because the government had never patented the property. A settlement was reached in 1982 whereby title was quieted in the government in exchange for a payment of about $ 200,000.  Subsequently, however, the former owners discovered records which allegedly showed that the property in question had been granted by Spanish authorities to a private party prior to 1803 and had therefore not passed to the United States as part of the Louisiana Purchase. However, the United States Court of Appeals for the Fifth Circuit reversed and remanded with instructions to enter a judgment quieting title in favor of the former owners, as the court ruled that (1) the suit satisfied the elements of an "independent action" for obtaining relief from a judgment, under Rule 60(b) , (2) the Quiet Title Act (QTA) (28 USCS 2409a) also conferred jurisdiction over the suit, and its 12-year statute of limitations was subject to equitable tolling in this case, and (3) the government had no legitimate claim to the property." *United States v. Beggerly*, 524 U.S. 38, 39 (1998).

e.      "The bill in this case is filed May 13, 1876, more than twenty years after the rendition of the decree which it seeks to annul. During that time Richardson, the claimant, and the man who is personally charged with the guilt of the fraud, has died; his heirs, **who with himself were claimants in the suit, are not made parties, and the land has passed from his ownership to that of the present defendants [Throckmorton]** by purchase and conveyance... It would be a very dangerous doctrine, one threatening the title to millions of acres of land held by [State] patent from the government, if any man who has a grudge or a claim against his neighbor can... institute a suit in chancery in the United States to declare the [State] patent void."  *United States v. Throckmorton,*  98 U.S. 61, 71 (1878).

## 5.      COLLINS ADMITTED PROOF OF TITLE WITH CERTAINTY FROM THE SOVEREIGN PATENT OF THE STATE OF TEXAS TO THE SIEBERMAN SURVEY LAND

a.      COLLINS title to Sieberman land from sovereign proven in title run sheet from independent certified professional landman.  Doc. 35, Exhibit A1.

b.      COLLINS title to Sieberman land from sovereign proven in title opinion included as exhibit in Complaint. Doc. 1.

c.      Sieberman predecessors claimed record title ownership of the Sieberman Survey land per documents filed in 1942 in the Montgomery County Property Clerk's records but never learned of the fedeal lawsuit, were never joined or noticed of suit or 1944 trial, nor did they learn of the 1944 judgment (that made no reference

to the Sieberman land or its owners) until approximately 2015 when HORTON claimed the Sieberman Survey did not exist in its suit against COLLINS. See sworn statements by COLLINS in Documents 1 and 35.

d.      In 1944, the federal court held the Hodge owners did not adversely possess any land, including implicitly COLLINS' Sieberman land.  In 2016, the Hodge owner (HORTON) claimed no adverse possession occurred by the Hodge owners of COLLINS' Sieberman land.

e.      The Sieberman land was thickly forested from the sovereign in March 1836 and was only occupied by COLLINS until HORTON razed it in 2016 during pendency of lawsuit over Sieberman land.  See Doc. 35, Exhibit A2.

6.      **HORTON LIED AND COMMITED FRAUD ON THE COURT SINCE 2015:**

a.      HORTON claimed Sieberman existed in the subdivision surveys it created and filed with the state government for approval.  See Exhibit B, Doc 35, Exhibit A3 and A4.   When HORTON learned COLLINS owned the Sieberman Survey land, HORTON fraudulently changed the government records to replace the *Sieberman Survey, A-497*, with "*David Thomas*, A-497", neither of which HHORTON owned an interest in nor could have included in its subdivision since it only only Hodge Survey land per its self-prepared warrantless deed  in 2012.  Horton filed a summary judgment asserting that the GLO patented, and still currently existent, Sieberman Survey, A-497,  did not even exist--as a means to cover their title fallacy that HORTON owned the Sieberman land because their Hodge Survey land usurped it by the void 1944 federal judgment. HORTON's attorney, Paul  McConnell (McConnell) confirmed to this court that he was aware the documents  HORTON filed with the local government that showing the existence of the patented Sieberman Survey on its own documents.  See Exhibit B, Doc. 35, Exhibit A3 and A4.  In fact, he was present at the local hearing where this fraud was presented to the City of Conroe Planning Commission but made no attempt to explain or correct HORTON's fraud.

b.      Contrary to McConnell's statement at the hearing last week, the State trial court granted summary judgment <u>only</u> on HORTON's quiet title claim and never tried COLLINS' trespass to try title claim.  *Collins v. D.R. Horton-Texas Ltd.*, 574 S.W.3d 39, 46 (Tex. App.-Houston [14[th] Dist.] 2017, pet. denied), *emphasis added.*

c.      Contrary to McConnell's statement at the hearing last week, the State court did not rule HORTON had title under the void 1944 judgment.  Rather, the State court ruled on summary judgment for quiet title that Sieberman Survey "did not exist" based on HORTON's sole basis for title:  the 1944 void judgment.  How can title to a GLO patent be based on a nullity?

d.      McConnell asserted HORTON was prevented from selling new "spec" homes on  COLLINS' Sieberman land due to COLLINS' lis pendens.  HORTON's

delay, if any, was due to NOT owning COLLINS' Sieberman land (or having title from the sovereign as COLLINS does). It should be noted that Montgomery County commissioners and the City of Conroe ordinances require verification of the existing GLO patent (being the existing and non-conflicted GLO Sieberman Survey, A-497) but HORTON did not own the Sieberman land or patent so should never have been able to obtain local government approval. See Exhibit B, Doc. 35, Exhibit A3 and A4. Contary to McConnell's statement, HORTON built and sold homes on the Sieberman land using its own title insurance and mortgage company from 2016 forward without regard to the Sieberman lawsuit.

e.      Contrary to McConnell's statements at the hearing last week, HORTON has only ONE deed that has NO warranty from the Hodge owners. That ONE warrantless deed that HORTON prepared covers, refers and conveys land dedicated to the Hodge Survey, A-19. That deed can in no way convey COLLINS' Sieberman Survey land to HORTON as the Sieberman Survey land could never have been conveyed by the 1944 void judgment, being the only document that HORTON argues supports its claim to COLLINS' Sieberman land.

f.      Contrary to McConnell's statements at the hearing last week, COLLINS' deed to his homestead in the David Thomas Survey, A-550, never referenced the Sieberman Survey or identified it. McConnell's statement was a blatant lie to this court.

g.      All statements referenced at the hearing last week are transcribed in the certfied transcript attached to this post-hearing brief. See Exhibit A.

COLLINS' compliant is not barred by *res judicata*. This court should grant COLLINS' reconsideration so that the grave miscarriage of justice can be corrected by this federal court of original jurisdiction to support the that a judgment may not be entered without notice or service in breach of the Constitution, a void judgment cannot be relied upon as the sole basis for title to land, and the rights of the State to determine and govern its own land patents are not stripped by the fraud upon a federal court by bad actors such as HORTON and its predecessors in title.

Respectfully submitted,

s/ Toni L. Sharretts Collins
TONI L. SHARRETTS COLLINS
11054 North Hidden Oaks
Conroe, Texas  77384
iceattorney@aol.com

281-827-7749

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 9th day of Feb., 2021, a true and correct copy of the foregoing instrument has been e-served to counsel of record, including lead counsel:

Paul J. McConnell, III and Ben Baring
De Lange Hudspeth, McConnell & Tibbets, LLP
1177 West Loop South, Suite 200
Conroe, TX  77301
(713) 871-2000 - telephone

/s/ Toni Sharretts Collins
Toni Sharretts Collins

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| | | |
|---|---|---|
| 1. NAME <br> Toni Collins | 2. PHONE NUMBER <br> (281) 827-7749 | 3. DATE <br> 2/3/2021 |

| | | | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL <br> iceattorney@aol.com | 5. CITY <br> Conroe | 6. STATE <br> TX | 7. ZIP CODE <br> 77384 |

| 8. CASE NUMBER <br> H-20-1897 | 9. JUDGE <br> Judge Lynn Hughes | DATES OF PROCEEDINGS |
|---|---|---|
| | | 10. FROM 2/3/2021    11. TO 2/3/2021 |

| 12. CASE NAME <br> Collins v. Horton | LOCATION OF PROCEEDINGS |
|---|---|
| | 13. CITY Houston    14. STATE TX |

**15. ORDER FOR**

- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [x] CIVIL
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [ ] BANKRUPTCY
- [ ] OTHER

**16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)**

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [x] OTHER (Specify) | |
| [ ] SENTENCING | | Hearing | 2.3.2021 11 am-4 pm |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| 14-Day | [ ] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| 3-Day | [ ] | [ ] | NO. OF COPIES | | |
| DAILY | [x] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.) <br> By signing below, I certify that I will pay all charges <br> (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE <br> s/ Toni Collins | PROCESSED BY |
|---|---|
| 19. DATE <br> 2/3/2021 | PHONE NUMBER |

| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| DEPOSIT PAID | | DEPOSIT PAID | |
|---|---|---|---|
| TRANSCRIPT ORDERED | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE | 0.00 |

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

**INSTRUCTIONS**

## GENERAL

**Use.** Use this form to order the transcription of proceedings. Complete a separate order form for each case number for which transcripts are ordered.

**Completion**. Complete Items 1-19. Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Submitting to the Court.** Submit the form in the format required by the court.

**Deposit Fee.** The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court. Upon receipt of the deposit, the court will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.** The court will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19. These items should always be completed.
Item 8. Only one case number may be listed per order.
Item 15. Place an "X" in each box that applies.
Item 16. Place an "X" in the box for each portion requested. List specific date(s) of the proceedings for which transcript is requested. Be sure that the description is clearly written to facilitate processing. Orders may be placed for as few pages of transcript as are needed.
Item 17. *Categories*. There are six (6) categories of transcripts which may be ordered. These are:
 *Ordinary*. A transcript to be delivered within thirty (30) calendar days after receipt of an order. (Order is considered received upon receipt of the deposit.)
 *14-Day*. A transcript to be delivered within fourteen (14) calendar days after receipt of an order.
 *Expedited*. A transcript to be delivered within seven (7) calendar days after receipt of an order.
 *3-Day*. A transcript to be delivered within three (3) calendar days after receipt of an order.
 *Daily*. A transcript to be delivered following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
 *Hourly*. A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.
 *Realtime*. A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the ordinary delivery rate.

 *Ordering*. Place an "X" in each box that applies. Indicate the number of additional copies ordered.
 *Original*. Original typing of the transcript. An original must be ordered and prepared prior to the availability of copies. The original fee is charged only once. The fee for the original includes the copy for the records of the court.
 *First Copy*. First copy of the transcript after the original has been prepared. All parties ordering copies must pay this rate for the first copy order.
 *Additional Copies*. All other copies of the transcript ordered by the same party.
Item 18. Sign in this space to certify that you will pay all charges. (This includes the deposit plus any additional charges.)
Item 19. Enter the date of signing.

Shaded Area. Reserved for the court's use.

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3     ***************************************************************

4     JAMES K. COLLINS, MD         4:20-CV-01897

5
     VS.                     HOUSTON, TEXAS
6

7     D R HORTON-TEXAS LTD        FEBRUARY 3, 2021

8
     ***************************************************************
9
                TRANSCRIPT OF MOTION PROCEEDINGS
10      HEARD BEFORE THE HONORABLE LYNN N. HUGHES
              UNITED STATES DISTRICT JUDGE
11
     ***************************************************************
12

13    APPEARANCES:

14    FOR THE PLAINTIFF:        MS. TONI SHARRETTS COLLINS
                          Law Office of Toni L. Sharretts
15                       11054 North Hidden Oaks
                       Conroe, Texas 77384
16

17    FOR THE DEFENDANT:        MR. PAUL J. McCONNELL, III
                       MR. BEN A. BARING, JR.
18                     MR. TRAVIS PIPER
                       DeLange Hudspeth
19                        McConnell Tibbets
                       1177 West Loop South
20                       Suite 1700
                       Houston, Texas 77027
21
                       MR. CARL R. DAWSON
22                     Ryan Dawson
                       770 South Post Oak Lane
23                     Suite 600
                       Houston, Texas 77056
24
        Proceedings recorded by mechanical stenography,
25    transcript produced via computer.

1    Official Court Reporter:        Lanie M. Smith, CSR, RMR, CRR
                                     Official Court Reporter
2                                    United States District Court
                                     Southern District of Texas
3                                    515 Rusk
                                     Room 8004
4                                    Houston, Texas 77002

11:01AM   5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          THE COURT:  Thank you.  Be seated.

3               I assume y'all have not gotten anywhere talking

4    with each other.

11:10AM  5          MR. MCCONNELL:  No, Your Honor.

6          THE COURT:  Does somebody have the record from the

7    court in 1944?

8          MR. MCCONNELL:  No, Your Honor.

9          THE COURT:  I don't want the whole, but just if there's

11:11AM 10    an opinion and a judgment.

11          MR. MCCONNELL:  Your Honor, if I may approach?

12          THE COURT:  Please.

13               Two things about time.  The clock is wrong.

14    Point 2 is I have a meeting about 20 minutes away at noon, so

11:11AM 15    reluctantly I may have to make y'all go eat something.

16          MR. MCCONNELL:  Your Honor, if I may, we also have the

17    trial court's judgment if the Court would like that.

18          THE COURT:  This one?

19          MR. MCCONNELL:  Yes, Your Honor.  The '44.

11:12AM 20          THE COURT:  Or the state court?

21          MR. MCCONNELL:  No.  This is this Court back in 1944,

22    and then what I gave you is the Fifth Circuit opinion on the

23    appeal from this judgment.

24          THE COURT:  Okay.  I thought you were talking about

11:12AM 25    something I had done or they'd done, but I wasn't here in '44.

1    It was '48 before I got here.

2            Can you imagine producing the typescript with all

3    the metes and bounds and things in an era of mechanical

4    typewriters or electric ones for that matter?

11:13AM    5            MR. MCCONNELL:  They did it.

6            THE COURT:  I don't suppose anybody has retyped this.

7            MR. MCCONNELL:  No, Your Honor.  But we do have a

8    graphic where we took the metes and bounds from the 1944

9    judgment and we superimposed on it the property that was in

11:13AM   10    dispute in our lawsuit and it's part of our motion for summary

11    judgment in the trial court -- in the state court action in

12    this case.

13            THE COURT:  I think I've seen it, but do you have an

14    extra one?  Mr. Baring is going to run out of stuff before we

11:14AM   15    get going.

16            Mr. Dawson, did you ride in from Weimar today?

17            MR. DAWSON:  Actually I did, Judge.  It was 45 and

18    clear this morning, and I hopefully will be headed back west a

19    little bit later.

11:14AM   20            MR. MCCONNELL:  Your Honor, if I may?

21            MR. DAWSON:  We're getting fiber optic out there so I

22    actually -- my Internet will be faster there than in my office

23    in Houston.

24            THE COURT:  Well, I don't have Internet for the same

11:15AM   25    reason I don't have a house on my place.  I stay in the motel

1    in town.  I don't go to the farm to figure out why hot water is

2    not hot or why the air-conditioning doesn't work or how many

3    lizards can live in the kitchen.  I want that to be somebody

4    else's problem.

11:15AM  5    MR. MCCONNELL:  Your Honor, what I've given the Court

6    is the green is the big tract that was involved in the 1944

7    judgment.  The red on the inside of that is the tract that D R

8    Horton bought.

9    THE COURT:  I don't have any green on this one.

11:15AM 10    MR. MCCONNELL:  Well, maybe it's just black.  It just

11    copied black, Your Honor, not green.  But the black outline --

12    the heavy black outline is the tract that was involved in the

13    1944 lawsuit and the red that is within that tract is the tract

14    that D R Horton bought.

11:16AM 15    THE COURT:  So according to this, it starts over here

16    in the southwest corner and goes all the way -- does it go to

17    that first vertical line after the survey or all the way to the

18    river?

19    MR. MCCONNELL:  It goes all the way to the -- well, our

11:16AM 20    tract doesn't go all the way to the river, but the big tract I

21    think goes all the way.

22    THE COURT:  The original tract?

23    MR. MCCONNELL:  That's the original tract.  It was

24    1200-and-some-odd acres that was involved in the original

11:16AM 25    lawsuit and we only have a portion of that tract.

1      THE COURT:  And so the tract at issue in the state

2  court proceedings, which I'll call recent, is the 750 --

3      MR. MCCONNELL:  750 acres.

4      THE COURT:  .7.

11:17AM   5      MR. MCCONNELL:  Right.  And actually it's just the

6  southerly portion of that because the Collins claim does not go

7  all the way to the north of that 750-acre tract.

8      THE COURT:  So it's up to it looks like a tributary.

9      MR. MCCONNELL:  Right.  And actually it's only -- I

11:17AM  10  think it's a thousand feet up from the southern boundary of the

11  750-acre tract is all that the Collins are claiming.

12      MS. COLLINS:  Your Honor, I have a certified copy of

13  the GLO map that shows the three surveys that are in question

14  and it separates it out.

11:17AM  15      THE COURT:  If this is the one -- I'll look at it, but

16  it looks like 42 acres in the lower right-hand corner, the red,

17  is that at issue?

18      MR. MCCONNELL:  No.  That's not the part that's at

19  issue.  It's the big --

11:18AM  20      THE COURT:  The big trapezoid?

21      MR. MCCONNELL:  Right.  The big trapezoid.  Or actually

22  the southern portion of the big trapezoid.

23      THE COURT:  All right.  Does your claim go to the

24  International and Great Northern Railway?

11:20AM  25      MS. COLLINS:  Our claim actually does go -- it spans

1    more than what's covered in this lawsuit, but the entire

2    Sieberman patent is at issue in this case -- in this federal

3    case.

4              THE COURT:  I don't have a survey of -- I have a bunch

11:20AM  5    of minor tracts that are shown on this Land Office map, but it

6    doesn't tell me whether the Montgomery County school land

7    that's on both sides at this point of the International and

8    Great Northern Railway, it goes from essentially south to north

9    across the land.

11:21AM  10             And then we've got this strip that runs from the

11   San Jacinto River on the east off to the west and you say

12   everything under the Frederick Sieberman survey?

13             MS. COLLINS:  Is in question.  Some of it has been

14   adversely possessed over the years, but not this section.

11:21AM  15             THE COURT:  I'm sorry.  You're going to have to lower

16   your mask just for this.

17             MS. COLLINS:  Oh, thank you.

18             The portion of the Sieberman survey at issue in

19   the state court was a strip that Mr. McConnell provided you a

11:22AM  20   plat of.  The entire Sieberman survey though is at issue in

21   this federal court because the rulings tried to vacate a

22   patented survey.

23             Some of the land has been adversely possessed

24   that's closer to -- that's on the east that's closer to, I want

11:22AM  25   to say the freeway or the railroad.  But that's not at issue in

1    the state court.  It is at issue in this Court because the

2    Sieberman was basically deemed to not exist in the state court.

3                    But, yes, the entire highlighted yellow Sieberman

4    is what's at issue in this Court.

5    THE COURT:  This survey seems to show that Frederick

6    Sieberman is claiming or once claimed the top strip of the

7    Pyle, P-Y-L-E; Thomas and Dugat.

8    MS. COLLINS:  Yes.  And that was by judicial fiat.

9    That particular part of the Sieberman was -- there was a ruling

10   that because they were joined in the case that they didn't own

11   that, but that's not at issue in the state court.

12   THE COURT:  Who didn't own it?

13   MS. COLLINS:  Mr. Sieberman and his heirs.

14   THE COURT:  Mr. Sieberman didn't own what's shown as

15   the overlap here?

16   MS. COLLINS:  The part that's just above the Dugat and

17   the area that's to the east.  There's a few little tracts over

18   there where it's kind of narrow, right close south of the

19   river.  That part has been judicially determined not to belong

20   to the Sieberman heirs, but that was just, like, a 40-acre

21   tract out of 743 acres, which was the one-third-league

22   Sieberman.

23   THE COURT:  Four acres.  Don't mess with my four acres.

24   MS. COLLINS:  Or 40.  40 acres.

25   MR. MCCONNELL:  Your Honor, if I may, the lawsuit that

1    they have brought here -- the 1944 judgment only adjudicated

2    title to a portion of the Sieberman, the portion that was

3    involved in the state court.  It only adjudicated title to a

4    portion of the Sieberman.  This case, the 1944 case did not

11:24AM  5    involve the entire Sieberman property.  It only involved

6    1209 acres, I think, out of the Sieberman.  Actually not out of

7    the Sieberman.  1209 acres total, which is probably maybe a

8    hundred and some-odd acres out of the Sieberman.

9            So that's really not what we're here on is the

11:25AM 10    rest of the Sieberman because it wasn't involved in the '44

11    case and it wasn't involved in the state court case.

12            What happened in the state court case was that

13    Dr. Collins brought a trespass to try title claiming a portion

14    of the property in the Sieberman that happens to be the Horton

11:25AM 15    tract.  They lost that case.  That case was appealed, and they

16    lost again on appeal.  Went to the Texas Supreme Court.  Texas

17    Supreme Court denied the petition for review.  And then they

18    went to the United States Supreme Court, and the United States

19    Supreme Court denied their petition for writ of certiorari.

11:25AM 20            That case is over.  It has been adjudicated that

21    they do not have title to that strip in which we're interested,

22    and that's why we think that this case ought to be dismissed.

23            THE COURT:  Tell me the strip that is covered.

24            MR. MCCONNELL:  Well, I don't know what's covered

11:26AM 25    because all I know -- I'm only involved -- we're only

1    involved -- Horton is only involved in the 750-acre tract of

2    land that we bought.  And we don't -- I won't say we don't care

3    what happens to the rest of it, but we don't have a dog in that

4    fight.

11:26AM  5           THE COURT:  So your claim is essentially the

6    David Thomas and John N. Thomas vertically south of the word

7    "Sieberman"?

8           MR. MCCONNELL:  Right.  What we do is we claim starting

9    at the north line of the David Thomas and to the north of that

11:26AM 10   and that is what was involved in our state court suit and that

11   was what was adjudicated in our favor.  Dr. Collins was

12   claiming title to it, and he lost.

13          THE COURT:  All right.  From the north line of

14   Thomas --

11:26AM 15          MR. MCCONNELL:  Yes, Your Honor, to the north.

16          THE COURT:  Up into the Hodge Survey?

17          MR. MCCONNELL:  Into the Hodge Survey.  All the way up

18   into the Hodge Survey.

19          MS. COLLINS:  And, Your Honor, the Hodge Survey on that

11:27AM 20   plat is currently patented; and the GLO shows it's one league.

21   The Hodge Survey is one league.  It was never more than one

22   league.

23               The 1944 judgment increased and enlarged that

24   Hodge Survey to over one league without any -- with nothing

11:27AM 25   more than fraud to the Court by not having the Sieberman owners

1    come forth to say -- and the GLO to show that this is the

2    actual boundary.  And while the state suit only covered a --

3    they were only claiming a portion because that's what

4    D R Horton purchased, the state suit had the effect of

5    extinguishing by the words the actual Sieberman survey in

6    total.

7            We're only -- today we are arguing for the

8    vacatur of that 1944 judgment because it not only increased the

9    Hodge, it took away that little strip of the Sieberman which is

10   actually 432 acres, not a hundred.

11           So there's a 432-acre additional amount of

12   acreage that was gained in the 1944 suit that was over and

13   above what the outlines of the one-acre one Hodge Survey were.

14       THE COURT:  But the contest is his client has Hodge --

15   well, there are several Hodges, so James Hodge.

16       MS. COLLINS:  Right.

17       THE COURT:  And the -- it goes all the way to the north

18   line of the David Thomas Survey which then whacks the middle

19   out of the Sieberman thing.

20       MS. COLLINS:  Yes.

21       MR. MCCONNELL:  Well, Your Honor, I'm not -- yes, I

22   guess you could phrase it that way but that was what was

23   determined back in 1944 and that's what they sued on.  They

24   sued -- the same suit that they're bringing today they brought

25   in a trespass to try title in our state court suit and they

1    lost, which means that title was adjudicated as to that tract

2    of land adversely to them and that's a final judgment at this

3    point in time.

4          MS. COLLINS:  And, Your Honor, there was no trespass to

11:29AM  5    try title ever tried in the state court.  That's why we're

6    here.

7          THE COURT:  Ma'am, he didn't interrupt you.

8          MR. MCCONNELL:  Yes, Your Honor --

9          THE COURT:  I taught her better in law school.  I'm

11:29AM 10    going to have to go back and adjust some of those grades.

11          MR. MCCONNELL:  But what happened is they did bring a

12    counterclaim in trespass to try title in the state court suit

13    and they lost that suit.

14          THE COURT:  And what's the date of that suit?

11:29AM 15          MR. MCCONNELL:  That was 2016.  I think we filed the

16    suit in 2015, and they filed their counterclaim in 2016

17    claiming title under the Sieberman heirs.

18          THE COURT:  And that's the one that's been appealed all

19    the way up?

11:30AM 20          MR. MCCONNELL:  That's the one that's been appealed,

21    and it's over.  There's nothing they can do about that.  That's

22    the final judgment.

23          THE COURT:  Who was the federal judge in '44?

24          MR. MCCONNELL:  I'm trying -- Ben, we've got that

11:30AM 25    somewhere.  It's on the judgment.

```
 1              Judge Kennerly.

 2         THE COURT:  Judge Kennerly.  Makes me feel old.

 3         MR. MCCONNELL:  Well, Judge Kennerly; and then I'm

 4    trying to see who wrote the opinion in front of Sibley, Waller

 5    and Lee were the Circuit judges back in '47.  That was even

 6    before I was born.  That was that long ago.

 7         THE COURT:  It wasn't before I was born.  When I showed

 8    up, everything was hunky-dory; but then you younger people must

 9    have messed it up because it was all fine when I showed up.

10         MR. MCCONNELL:  Well, Gene Pittman taught me how to

11    mess it up.

12         MS. COLLINS:  Your Honor, I just wanted to say

13    something.

14         THE COURT:  Yes, ma'am.  Speak up.

15         MS. COLLINS:  I want to clarify a few things that may

16    have been incorrect that Mr. McConnell said.

17         THE COURT:  Ma'am, come use the microphone.  It's a big

18    room.

19         MS. COLLINS:  Okay.  We brought a -- they brought a

20    quiet title suit on this land when Horton purchased the land

21    and then when we learned through that suit that they did not

22    acquire the Sieberman land because the original parties weren't

23    joined and it was taken from them and then we learned that

24    those parties did acknowledge ownership, we went and I did all

25    the research.
```

11:30AM
11:31AM
11:31AM
11:32AM
11:32AM

1        I went to the Federal Archives in Fort Worth and

2   I read the entire transcript of Judge Kennerly's trial, the

3   two-week bench trial.

4        And at that point, the Sieberman was never

11:32AM   5   brought up.  There was a survey issue and they never had

6   brought the General Land Office in to even identify, like they

7   were supposed to under law, to confirm where the benchmarks or

8   the witness marks were.

9        So the Sieberman survey -- we knew all along

11:33AM   10   living next to it that it existed because we could see it on

11   all the plats.  We could see it on the MCAD plats, we just

12   didn't know who owned it and we didn't care because we were

13   just happy to have a forest next to us.

14        When Horton came and bought the land and then

11:33AM   15   sued us for quiet title, that triggered me to go look into the

16   ownership.  And when I looked into the ownership, I discovered

17   the Siebermans weren't joined and their deed improperly

18   described -- their deed that they created theirself --

19   self-prepared and warrantless deed -- described the entire

11:33AM   20   survey down and usurped Sieberman as though that judgment was

21   accurate.

22        And what Mr. McConnell is saying or had said is

23   that we brought a trespass to try title and it was tried.  That

24   is not true.  Horton had brought a quiet title, and we filed a

11:33AM   25   trespass to try title because I went and got the title from all

1    the Sieberman heirs.

2         THE COURT:  I don't care what they brought.  If they

3    won, they got what they asked for.

4         MS. COLLINS:  But they didn't get it under a trespass

5    to try title.

6         THE COURT:  Ma'am, that doesn't matter.  They didn't

7    get it originally from trespass to try title.  They got it from

8    some Texans who stole it from some other people --

9         MS. COLLINS:  Right.

10        THE COURT:  It's all very complicated.

11        MS. COLLINS:  There's a few things that weren't in my

12   brief that I wanted to bring to the Court's attention and that

13   is you had ruled on *res judicata* that this been tried before.

14   The vacatur has never been tried, and there's a case --

15        THE COURT:  Ma'am --

16        MS. COLLINS:  I'm sorry.

17        THE COURT:  It's tried if nobody ever speaks to me.  I

18   get the pleadings --

19        MS. COLLINS:  Okay.

20        THE COURT:  -- I get an answer and I rule for the

21   defendant or the plaintiff.  It's tried.

22        MS. COLLINS:  Right.  It's being tried now though.

23        THE COURT:  It can't be retried.

24        MS. COLLINS:  Right.

25        THE COURT:  You get to try it once and you're stuck

 1    with what those people did to your title which makes title

 2    insurance thrive.

 3            MS. COLLINS:  Right.  But there is a case -- *Beggerly,*

 4    also in this court -- and I'm going to quote it because it's so

 5    important.  "Independent actions for nullity when a party is

 6    prevented from making a departure from the rigid adherence of

 7    *res judicata* are an exception to *res judicata.*"

 8                And that's *Beggerly* 1978.

 9            THE COURT:  What were the facts?

10            MS. COLLINS:  And the action of a nullity can only be

11    brought in the same court --

12            THE COURT:  Wait.  Don't read that to me.  What were

13    the facts of that case that the quote comes from?

14            MS. COLLINS:  The facts in *Beggerly?*

15            THE COURT:  Whatever you're reading to me.

16            MS. COLLINS:  Okay.  In *Beggerly*, it was a case where

17    the United States wanted to take land in Mississippi and they

18    said there's no patent and they entered a settlement agreement.

19                And when the people that had entered the

20    settlement agreement saying, "Well, I guess there's no patent.

21    We don't own this land," they went back later because there was

22    a 12-year period within the settlement agreement they could

23    contest it and said, "We found the patent.  The settlement

24    agreement is wrong.  We came back to the -- we're coming back

25    and we want you to undo this."

1        And the government said, if you had never been

2   joined, entered a settlement agreement and had the opportunity

3   to argue that case and look at the -- and had the opportunity

4   to look at the discovery, if you had not been joined, then the

5   nullity, we could void this judgment because there would be --

6   the nullity must be brought in the same court -- the district

7   court, this one.

8        But they said because you had the opportunity in

9   settlement over the last 12 years to determine that no patent

10   existed and that you found one now, we can't rule in your favor

11   because you actually had a trial.  You had the opportunity to

12   see discovery.

13        But the exception is if the action of a nullity

14   must be brought in this Court if this was the Court that

15   entered the judgment that was void because there wasn't

16   joinder.

17        And you actually said in your own case, and you

18   may remember this case.  It wasn't that long ago.

19        THE COURT:  It's my opinion, not my case.

20        MS. COLLINS:  I'm sorry.  Okay.  It was your opinion.

21        But you had stated in your opinion in *Wuxi Taihu

22   Tractor,* and it's quoted.  A suit to void a judgment because of

23   a procedural error or misapplication of law, like we have here,

24   must be brought in the same court that rendered the judgment

25   because it's a continuation of the underlying suit.

1                    And even more importantly a Rule 60(b) motion --

2          THE COURT:  That means --

3          MS. COLLINS:  Huh?

4          THE COURT:  That means you can't go to Kansas and go in

5    a federal court and litigate a state court title in Texas most

6    of the time.

7          MS. COLLINS:  Yeah, and that's true.

8          THE COURT:  There are exceptions to all of it.

9          MS. COLLINS:  And that is true.  But the Rule 60(b)

10   motion says specifically it must be filed, the Rule 60(b), to

11   vacate -- they couldn't do this in the state court -- must be

12   filed in the district court in the action in which the original

13   judgment was entered.

14                    And that's *Bankers Mortgage versus United States*.

15                    And I've got a whole litany of cases that show

16   this is the only Court that could vacate the 1944 judgment.

17   There was never jurisdiction in the state court to do that, and

18   they didn't address it.  Horton didn't --

19         THE COURT:  Wait.  They don't need to vacate it because

20   they won it.

21         MS. COLLINS:  Well, according to -- no, they were using

22   that judgment as a basis for their title.  They didn't win it.

23         THE COURT:  That's fine, and you had an opportunity to

24   contest it.

25         MS. COLLINS:  The 1944 judgment could never have been

```
 1    contested in the state court.

 2             THE COURT:  You had the opportunity to contest it from

 3    the first time you became interested in this land.

 4             MS. COLLINS:  Which we did.  We did.  We contested it

 5    with a quiet title, and they never adjusted -- it actually

 6    says.

 7             THE COURT:  Which court did you file that?

 8             MS. COLLINS:  We filed it in the 284th.  And

 9    specifically it even says in the appellate opinion that Horton

10    did not plea but Collins did plea a trespass to try title and

11    this claim was not tried.  It wasn't tried, so we're trying to

12    try it now.  The trespass to try title wasn't tried.  The

13    vacatur couldn't have been tried.

14             THE COURT:  Was it pleaded?

15             MS. COLLINS:  Yes.

16             THE COURT:  Then if it was not expressly ruled on, it

17    is denied *sub silencio*.

18             MS. COLLINS:  But the vacatur could never have been

19    tried in the state court because they didn't have competent

20    jurisdiction because Rule 60 requires this Court.

21             THE COURT:  Is there anybody from out of down besides

22    Mr. Dawson?

23             MR. MCCONNELL:  No, Your Honor.

24             MR. DAWSON:  I don't believe so, Judge.

25             THE COURT:  He's the one from the city center and the
```

         1    rest of you are from suburbs towards Weimar.

         2              I have to go make my appearance.  How about we

         3    reconvene at 2:00?

         4         MR. MCCONNELL:  That's fine with me, Your Honor.

11:40AM  5         THE COURT:  Let's do it.  All right.  I'm sorry about

         6    that; but as you saw, there was a crowd here this morning for

         7    some reason.

         8         THE LAW CLERK:  All rise.

         9                   (Court is in recess.)

02:14PM 10         THE COURT:  Thank you.  Be seated, please.

        11         Mr. McConnell.

        12         MR. MCCONNELL:  Yes, Your Honor.

        13         THE COURT:  What did you do?  Ruin the air-conditioning

        14    while we were at lunch?

02:14PM 15         MR. MCCONNELL:  I didn't do it.

        16         THE COURT:  And neither did GSA.  You'd think they're

        17    turning us into seals or something.

        18              So does D R Horton have an abstract?

        19         MR. MCCONNELL:  No, Your Honor.  We don't have an

02:15PM 20    abstract.  We do have a title insurance policy.  We don't have

        21    it with us today, but you know --

        22         THE COURT:  No, I trust you; but your predecessors in

        23    title become the winners of the 1944 litigation.

        24         MR. MCCONNELL:  We brought -- our predecessors in title

02:15PM 25    bought from the winners of the 1944 lawsuit.

1      THE COURT:  And do you remember who was next down the

2  chain of title?

3      MR. MCCONNELL:  Yes.  It was the Madeley family.

4  Foster Madeley, a long-time Conroe lawyer, and his family.

02:16PM  5      THE COURT:  What's his name?

6      MR. MCCONNELL:  Foster Madeley.

7      THE COURT:  I didn't know him.

8      MR. MCCONNELL:  And his nephew Will Metcalf is a state

9  rep out there, and they've owned it in their family since the

02:16PM  10  Sixties.

11      THE COURT:  I used to be an honorary landowner in

12  Montgomery County.  My wife inherited some land up there and we

13  had to sell something to pay the taxes and so the ranch got

14  sold; but what was left over, for obvious reasons, was about a

02:17PM  15  sixth of a lot, which abutted no street in Magnolia.  It was in

16  the middle of the block and I'm sure there's a story there

17  somewhere, but I got a call from Montgomery County and they

18  said they were building a new branch library in Magnolia and

19  what would we want for that valuable piece of land.

02:17PM  20          I said, "Well, tell me about this library."

21          And he told me.

22          And I said, "You are going to have a lot of real

23  books for early childhood?"

24          And he said, "Oh, yeah."

02:17PM  25          And I said, "Well, how about I just give it to

1    you?"

2         You know, I don't know how much it would have

3    cost to go through the shenanigans.

4         And so they said, "I think we can live with that

02:17PM   5    counteroffer."

6         And so I never looked at it, but it's kind of fun

7    to be able to help somebody with something that was a useless

8    source of tax revenue to Magnolia.

9         When is it your understanding that Dr. Collins

02:18PM   10   acquired anything in the chain?

11        MR. MCCONNELL:  I don't think he ever acquired anything

12   in the chain, Your Honor.

13        THE COURT:  Well, putatively.

14        MR. MCCONNELL:  Well, okay.  What happened is in 2015

02:18PM   15   my clients had purchased the property.  Horton had purchased

16   the property, and we sent a surveying crew out there to start

17   laying out the lots for the subdivision.  This was going to be

18   a big subdivision out there.

19        When we got out there, after we had been there

02:19PM   20   the first or second or third time, we got out there and

21   eventually Dr. Collins was stringing some fence in our

22   property.  At least that was our version of the story.

23        And so we then filed suit against Dr. and

24   Mrs. Collins for trespass onto our property and that was in

02:19PM   25   2015.

1            And in 2016 they then filed a counterclaim in

2      trespass to try title against us claiming title to the portion

3      that they contended was in the Sieberman survey that they had

4      purportedly gone to the Sieberman heirs and obtained a deed to.

02:19PM   5            In other words, first their claim was adverse

6      possession and then it morphed a year later --

7            THE COURT:  Skip that.

8            MR. MCCONNELL:  -- into a backfilling trespass to try

9      title action.

02:20PM  10            And that's what we tried.  We got a summary

11      judgment on their trespass to try title action.

12            THE COURT:  All right.  So Dr. Collins joined the chain

13      of title to the Horton property, to part of it, by claiming

14      from --

02:20PM  15            MR. MCCONNELL:  From people who they claim are

16      Sieberman heirs many generations removed.

17            One of them was -- I don't know whether you ever

18      remember Roger Metzger that used to play for the Astros.  One

19      of them was Roger Metzger or his family, maybe his wife's

02:21PM  20      family.  I don't know.  But anyway, he was one of them.

21            But they got quitclaim deeds from these people,

22      many who purported to be Sieberman heirs at the end of 2015 or

23      early 2016 and placed them of record and then amended their

24      pleadings.

02:21PM  25            THE COURT:  You say the Siebermans went back three

1    generations from this transfer?

2         MR. MCCONNELL:  Well, they went back I don't know how

3    many generations because Mr. Sieberman, as I understand it from

4    what the Collins plead, Mr. Sieberman was killed at the Battle

02:21PM   5    of Goliad and that he was awarded land by the State of Texas

6    after the revolution.  That's where the Sieberman league or

7    Sieberman survey claim comes from apparently.  I don't know

8    because I haven't done the research myself.

9         MS. COLLINS:  And, Your Honor, I did my own abstract of

02:22PM  10    title because I'm a landman and an attorney; but I didn't know

11    if the Court would recognize that because there's a bias

12    because I created it.

13              But I have and can create an abstract of title

14    from the very beginning of the sovereign 1836 all the way to

02:22PM  15    date and there was never any heirs named Metzger, but I have

16    every hair and it went back now four generations.

17         THE COURT:  Well, his mother may have been a Metzger.

18         MS. COLLINS:  No.  I know every heir and all their life

19    stories.  I know them, like, personally.  I negotiated their --

02:22PM  20         THE COURT:  So how much -- do you have -- do you have a

21    title policy?

22         MS. COLLINS:  I didn't need a title policy because by

23    the time we had gotten the motion for summary judgment on quiet

24    title, we couldn't argue the case anymore.  They said you can't

02:23PM  25    bring the Sieberman up even on a map anymore.

1          I don't need a policy.  I can get an abstract of

2    title, which is better, because I can show you the chain of

3    title with every heir without question and affidavits from the

4    current people and their bibles.  I talked to everybody

5    starting with --

6          THE COURT:  Well, you didn't talk to the widow

7    Sieberman after the Battle of Goliad.

8          MS. COLLINS:  No, he was only 19 when he was killed,

9    Frederick Sieberman, but his father, Gabriel Sieberman,

10   acquired the land and it went to James Collins and eventually

11   part of it went to Vernon Evans.  It just so happened the man

12   that owned the property was named James Collins, so I went to

13   the James Collins heirs.

14         THE COURT:  And he was no relation?

15         MS. COLLINS:  No.

16         THE COURT:  Did you know?

17         DR. COLLINS:  It's a French transfer.  We have the

18   actual transfer.

19         MS. COLLINS:  We could create a perfect abstract of

20   title, but --

21         DR. COLLINS:  I have it translated.  It's in French.

22         THE COURT:  Okay.  Ordinarily it's fine for you to

23   interrupt him, but in here it's not domesticity, to say the

24   least.

25              All right.

1        DR. COLLINS:  No.  I'm sorry.

2        THE COURT:  No.  It's her interrupting you that's the

3    problem; so if you want to take the risk and tell me something

4    she doesn't want you to say, I'm happy for you to do that.

02:24PM  5        DR. COLLINS:  Can I have a couple of minutes?

6        THE COURT:  Sure.

7        DR. COLLINS:  I was at lunch and I was jotting some

8    notes down and I apologize.

9        THE COURT:  All right.  You're going to have to lower

02:24PM 10    your mask while you're talking or nobody can hear.  And talk

11    right into the microphone like Willie Nelson does.

12        DR. COLLINS:  Willie Nelson with his past legal issues.

13            My frustration has grown throughout this case.

14    We've actually never had our case brought to a jury.

02:25PM 15        THE COURT:  Okay.

16        DR. COLLINS:  I'm sorry.  Let's not go back.  We're

17    losing the forest through the trees.  The state court --

18        THE COURT:  I'd have to let every one of them explain

19    why all the other stuff I did was wrong.

02:25PM 20        DR. COLLINS:  The state court was provided with

21    evidence of Horton's ownership of the Sieberman that was based

22    solely upon the 1944 judgment in this court.

23            The state court, not having the authority -- and

24    Ms. Collins can provide you with the case law and they provided

02:25PM 25    nothing to oppose that case law -- the state law not having the

1  authority to vacate that 1944 ruling accepted it on its face

2  value and based its entire judgment in favor of Horton, which

3  she should have if she took it at face value, for the quiet

4  title suit.

02:26PM  5          We couldn't do a -- obviously -- and you being a

6  state court judge know that the only way you can transfer title

7  in Texas of land is trespass to try title, and they couldn't do

8  that because they didn't have it to the sovereign.  We do.

9          THE COURT:  Well, there's also adverse possession,

02:26PM 10  but --

11          DR. COLLINS:  They don't claim adverse possession.

12          THE COURT:  Well, you don't either, so --

13          MS. COLLINS:  We actually did.

14          DR. COLLINS:  We actually did.  Okay.  I'm sorry.

02:26PM 15          THE COURT:  It's more complicated.

16          DR. COLLINS:  Sure it is.

17          In this case we filed a -- I'm sorry.  In this

18  case essentially a continuation, as we said earlier, of the

19  1944 case, we filed a Rule 60 for which there is no equivalent

02:26PM 20  in Texas state court so, therefore, the judge couldn't actually

21  vacate our case in the 1944 judgment.

22          Ms. Collins can better give you the case law only

23  why the state court didn't have the authority to vacate the

24  1944 judgment.  Again, this is the sole basis for Horton's

02:27PM 25  claim to the title, not to the sovereign.  It goes back to this

                1    point.  Let me just say --

                2         THE COURT:  We like to think we're sovereign.

                3         DR. COLLINS:  I mean to the sovereign.  I'm sorry.

                4         THE COURT:  We're not sovereign.  In fact, that should

02:27PM         5    be a bad word in a free republic.

                6         DR. COLLINS:  Okay.  I digress.  I'm sorry.

                7              We come before this Court under a Rule 60; and as

                8    I understand it -- and I'm not a lawyer -- this is the only

                9    court that can actually rule upon that 60 --

02:27PM        10         THE COURT:  I did, and you didn't like it.

               11         DR. COLLINS:  -- to show that the basis upon which the

               12    Horton claims the property was a void judgment.  No Sieberman

               13    heirs were joined.  That's not in question.  They were never

               14    joined.  That is not the dispute --

02:27PM        15         THE COURT:  Wait a minute.

               16         DR. COLLINS:  Yes, sir.

               17         THE COURT:  There's a rule of law.  You will pardon my

               18    defective Latin *jus tertii*.  It means you can base no claim on

               19    somebody else's claim.  You have to have a good claim.

02:28PM        20         DR. COLLINS:  Yes, sir; and we can show that --

               21         THE COURT:  Saying, "I want their land because he has

               22    better title than they do" --

               23         DR. COLLINS:  And we do have our claim.

               24         THE COURT:  Well, that's debatable.

02:28PM        25         DR. COLLINS:  But understand their entire basis for

1   their claim is this 1944 judgment that -- okay.  Let's say

2   we're back in 1944.

3            THE COURT:  Okay.  No.  No.

4            DR. COLLINS:  You think typing was difficult?  Surveys

02:28PM   5   were difficult.  They were going to stop -- actually the

6   debate -- there was a debate over whether -- the authenticity

7   or the correctness of the survey in the testimony but --

8            THE COURT:  Have you ever looked at --

9            DR. COLLINS:  This case was filed on December 6, 1941.

02:28PM   10  December 7th was, of course, Pearl Harbor.  We had just entered

11  a war.

12           THE COURT:  We were open the Monday after Pearl Harbor.

13           DR. COLLINS:  Huh?  Oh, then it was filed December 7th,

14  wasn't it?

15           THE COURT:  Yes.

16           DR. COLLINS:  I think it was filed December 7th, 1941.

17           THE COURT:  Well, we were open the day after, which is

18  the 8th.

19           DR. COLLINS:  Correct.  I mean, this goes -- you said

02:29PM   20  typing was hard.  Imagine what having to stop a trial and redo

21  an entire survey of land out there.  It was in dispute.  They

22  didn't follow the rules, which the federal court should have

23  followed the rules of --

24           THE COURT:  Wait a minute.  Who was supposed to get a

02:29PM   25  survey?

```
 1              DR. COLLINS:  At this time the only survey provided was
 2    Boyles.
 3              MS. COLLINS:  You're going into the detail.
 4              He's going into the detail of the 1944 case,
 5    which I read the entire transcript.
 6              DR. COLLINS:  Okay.
 7              MS. COLLINS:  There was no --
 8              THE COURT:  I want a survey.  I don't --
 9              DR. COLLINS:  I'm sorry.
10              THE COURT:  I know that there's a Land Office map here.
11              DR. COLLINS:  The metes and bounds was what was
12    provided to the Court.  There never was a survey, nor was --
13    they didn't even do it to the witness marks.
14              THE COURT:  Wait a minute.
15              DR. COLLINS:  Yes, sir.
16              THE COURT:  If you trace the metes and bounds, what
17    does it show?
18              DR. COLLINS:  The metes and bounds show that, but it
19    shows an area of land that includes the Sieberman.  They had
20    title to the Hodge.  This case in 1944 was the Hodge.  It
21    involved none of the Sieberman, but they -- you said taking
22    somebody else's land.  Okay.  I own this land over here and --
23              THE COURT:  Wait, wait, wait.  Doctor, I asked if
24    there's a survey.
25              You said there are only the metes and bounds.
```

02:29PM (line 5)
02:29PM (line 10)
02:30PM (line 15)
02:30PM (line 20)
02:30PM (line 25)

1           Metes and bounds will create a survey --

2           DR. COLLINS:  In that case.

3           THE COURT:  Wait.  Now, you really don't interrupt me.

4    You may be afraid to interrupt her.  You shouldn't be afraid to

02:30PM 5    interrupt me.  You should be ashamed.  I'm trying to take care

6    of this.

7           My point is they had a survey.  The metes and

8    bounds would delineate a property, and you would be amazed what

9    a guy with a pencil, pad, horse and sextant could do.  I had a

02:31PM 10   case with about 3,000 acres, lots of turns; and when I got the

11   case I took it to a friend who is a surveyor and he ran it

12   through his computer that generates the map from the metes and

13   bounds and they were like -- after four or five miles of survey

14   on the coastal plains -- so it's not like they've got rocky

02:31PM 15   outcroppings to mark and things, it was like 180 feet off,

16   cumulative error.  These nice young men with their electronic

17   everything might not be able to do that good.

18           You've never claimed under the Sieberman, right?

19           DR. COLLINS:  Yes, we have.

02:32PM 20   THE COURT:  That's who got your title.

21           DR. COLLINS:  I'm sorry?

22           THE COURT:  That's who gave you your title.

23           MS. COLLINS:  No.

24           DR. COLLINS:  Through the Siebermans.

02:32PM 25   THE COURT:  Pardon?

1          DR. COLLINS:  The Sieberman heirs.  Mr. Sieberman was

2    killed in Goliad.  His father is --

3          THE COURT:  Well, you keep telling me that.  I'm not

4    sure about that.  I'm not that old.

02:32PM  5          DR. COLLINS:  Well, we have the French derivative of --

6    and we actually have the original patents.  We have everything.

7    We very the original -- we have two original surveys done in

8    1858.

9          MS. COLLINS:  1857 and 1878.

02:32PM 10          Your Honor, may I interject one little thing?

11          THE COURT:  The problem is all that stuff existed in

12   1944.

13          DR. COLLINS:  Exactly.  But the Siebermans weren't

14   involved, so who is going to bring this up?

02:32PM 15          THE COURT:  No, wait.

16          MS. COLLINS:  The survey did not use the right witness

17   marks.  That was the problem.

18          DR. COLLINS:  They see this extra third of land added

19   to their property and, "Hey, Susie, what do you think about

02:32PM 20   that?  That's not our land.  Shh.  Quiet.  Quiet.  Just keep it

21   quiet."

22          Who is going to stop them from taking that land?

23   There was no Sieberman heirs there to say, "Hey, wait a minute.

24   That's our land."

02:33PM 25          THE COURT:  Well, when people from Conroe go stomping

1    around on your land --

2         DR. COLLINS:  Nobody was there.  This was

3    1940-something.

4         THE COURT:  Well, if they owned it, did they pay taxes

02:33PM  5    every year?

6         DR. COLLINS:  I don't know.

7         THE COURT:  She's nodding.

8         DR. COLLINS:  Nobody had paid taxes for --

9         MS. COLLINS:  I talked to some of the heirs.

10        DR. COLLINS:  -- several years.

11        MS. COLLINS:  It's my understanding that they did.  It

12   was a long time ago.

13        THE COURT:  I want yeses and nos.  I don't want

14   stories.

02:33PM  15        DR. COLLINS:  Well, we can find that out.  If we have a

16   hearing, we can find that out for sure, because I would say

17   that nobody paid taxes on that land for many years.

18        THE COURT:  Before you bought a third of the

19   Sieberman -- is that right, or did you buy the whole strip?

02:34PM  20        MS. COLLINS:  When I negotiated the --

21        THE COURT:  I can't hear you.

22        MS. COLLINS:  When I negotiated the -- when I obtained

23   the title from all of the heirs, I asked them for anything they

24   had in all of the Sieberman; so it covered everything, although

02:34PM  25   this suit only covers a portion of it.  432 acres is what was

|  | |
|---|---|
| 1 | improperly marked and identified by a survey that didn't even |
| 2 | use the correct witness marks and that's in the appellate -- |
| 3 | THE COURT:  Ma'am, ma'am, you don't have your own |
| 4 | survey; so don't bad-mouth other surveys.  At least -- |
| 02:34PM 5 | MS. COLLINS:  Our survey is the GLO. |
| 6 | THE COURT:  -- they've got one. |
| 7 | DR. COLLINS:  Our survey is the GLO. |
| 8 | MS. COLLINS:  It's the one that -- there was a -- |
| 9 | DR. COLLINS:  It's the -- |
| 10 | MS. COLLINS:  -- no-conflict survey. |
| 11 | THE COURT REPORTER:  You need to speak one at a time, |
| 12 | please. |
| 13 | THE COURT:  Or none at a time. |
| 14 | This is not a survey. |
| 02:34PM 15 | MS. COLLINS:  Right. |
| 16 | THE COURT:  It's a title map that shows you what the |
| 17 | State of Texas thinks the boundary lines are.  It shows an |
| 18 | overlap on this map.  It does not give you title. |
| 19 | MS. COLLINS:  Right. |
| 02:35PM 20 | DR. COLLINS:  I can pull it up.  It's on the GLO |
| 21 | website. |
| 22 | MS. COLLINS:  The patents. |
| 23 | THE COURT:  I don't want to look at their website.  I |
| 24 | want to look -- |
| 02:35PM 25 | DR. COLLINS:  No, it's the patented survey.  It's the |

1    actual written -- handwritten notes of the surveyors showing

2    that that survey exists and it was done twice just to make sure

3    there was no conflict and I can get the actual notes.

4         THE COURT:  But if you start with the wrong premise,

02:35PM  5    you end up with the wrong answer, conclusion.

6              So you told me that the Siebermans didn't take

7    possession of it from 1836 to when, or '35 to when?

8         DR. COLLINS:  "Didn't take possession"?  I'm not sure

9    what you mean.

02:36PM  10        THE COURT:  I can't hear you.

11        DR. COLLINS:  I'm not sure what you mean by "didn't

12   take possession."  They were there, but they were granted the

13   head right to the lands.

14        MS. COLLINS:  The Siebermans did not have actual

02:36PM  15   possession, but the Hodge owners did not either.  No one lived

16   on the land.  It --

17        DR. COLLINS:  Nobody lived on the land.

18        MS. COLLINS:  -- was forest.

19        THE COURT:  I don't care what the Hodges did.  I asked

02:36PM  20   you:  Did the Siebermans ever take possession of the land?  Did

21   they ever pay taxes?  None of that do you know, and it's shown

22   on this map as a questionable survey.

23        MS. COLLINS:  I have in my land title run sheet that I

24   had a different landman prepare for me, there are instruments

02:36PM  25   of record that show that the owners are claiming this in 1942

and paying taxes and wanted to fight it, but they were never
brought in to fight it.

THE COURT:  Wait a minute.  Who is that?

MS. COLLINS:  The actual owners, the Sieberman heirs.
There's a -- it's an -- there's a -- it --

DR. COLLINS:  They were never served.

MS. COLLINS:  It would be a part of our discovery, but
I have it.  They were claiming it.  They were saying, "We have
a right to this.  Go fight for this for us."

THE COURT:  Okay.  I'm going to point out something.  A
collection of quitclaims is not a reliable title.

MS. COLLINS:  That's all Horton has.

DR. COLLINS:  That's all they have, too.

THE COURT:  But you've got quitclaims after their
quitclaims to somebody else and so --

MS. COLLINS:  But they're asking for title that the
people never got to tell the Court, this very Court.

THE COURT:  Yes, they did.

MS. COLLINS:  They didn't.  They weren't joined.

DR. COLLINS:  How could they?  They were never joined.

MS. COLLINS:  Horton doesn't dispute that.

DR. COLLINS:  They were never notified that this land
was being taken.

THE COURT:  All right.  Both of you sit down.

Mr. McConnell.

1     MR. MCCONNELL:  Thank you, Your Honor.

2     THE COURT:  Are you going to let anybody else talk?

3     MR. MCCONNELL:  Well, Judge, I've been living with this

4  since 2015.

02:37PM  5     THE COURT:  Of course.  You're welcome.

6         Who sued in the '44 case?

7     MR. MCCONNELL:  The '44 case was -- the folks' names

8  were their predecessors in title to ours and it is -- the first

9  one the trial court case is *McCormack versus Grogan-Cochran*

02:38PM 10 *Lumber Company*.

11     THE COURT:  We can't hear you.

12     MR. MCCONNELL:  I'm sorry.  It is *McCormack versus*

13 *Grogan-Cochran Lumber Company*, the suit in '44.  It was a case

14 that was originally filed in the state court and was removed to

02:38PM 15 the federal court based on diversity of citizenship.  And then

16 that case was decided by Judge Kennerly and entered the

17 judgment.

18         And then it was appealed to the Fifth Circuit and

19 the style on appeal is *McComb versus McCormack*.

02:39PM 20     THE COURT:  All right.  And so who are they?

21     MR. MCCONNELL:  Well, these were a bunch of heirs who

22 were partitioning the property and determining the ownership of

23 the property.

24     THE COURT:  The property being in the Hodge survey?

02:39PM 25     MR. MCCONNELL:  Being the property that was described

by metes and bounds; and as the Court is aware, under Texas

Supreme Court decisions, metes and bounds controls over what

label you put on the thing.

THE COURT:  Yes.

02:39PM  MR. MCCONNELL:  If you say it's in the Hodge, but you

describe it by metes and bounds being somewhere else, then you

disregard the Hodge label to it.

But those are the people who sued and who

partitioned the property among themselves and there's a -- they

02:40PM  appointed a surveyor, as you often do in partition cases.  You

appoint a surveyor to make an equitable division of the

property.  That was what was done in the '41 case and it was

affirmed on appeal in '47 -- the '44 judgment.

And then after that the property was conveyed.

02:40PM  There were pipeline easements conveyed across it, everything,

all with reference to the 1944 judgment; and as a matter of

fact, when Dr. Collins bought his property to the south, his

plat referenced the 1944 judgment as being the northern

boundary of his property.

02:40PM  So clearly he knew about the 1944 judgment or at

least had constructive notice of it because it's on his plat

and that was part of our motion for summary judgment in the

trial court.

THE COURT:  So, say again.  You've got -- on the Land

02:41PM  Office map, you've got the Hodges running down from north of

```
          1    that tributary -- is it Spring Creek or something -- that's at

          2    the bottom.  And then the Sieberman property is part of a

          3    narrow rectangle, low height, long length, that goes beneath

          4    all of the Archibald Hodge and all of the James Hodge surveys.

02:42PM   5         MR. MCCONNELL:  On the GLO map.  That is correct,

          6    Your Honor.

          7         THE COURT:  Right.  And so the middle third of that is

          8    what Dr. Collins is claiming?

          9         MR. MCCONNELL:  Yes.  Dr. Collins is claiming the

02:42PM   10   southerly portion of what in the '44 judgment was deemed to be

          11   in the James Hodge survey, that portion where the Sieberman is

          12   shown on that GLO map as it comes down.

          13        THE COURT:  In case the city folk read the transcript,

          14   it's the General Land Office.

02:42PM   15             So if you take 1944 metes and bounds, it picks up

          16   at the San Jacinto River and goes west?

          17        MS. COLLINS:  It's not the San Jacinto River,

          18   Your Honor.  It's actually a creek that runs through there.

          19   The San Jacinto River is over to the east side of the property

02:43PM   20   involved in the 1944 judgment.

          21        THE COURT:  All right.  So what's marked

          22   Frederick Sieberman starts under Archibald Hodge, goes all the

          23   way under James Hodge; and then there's the Thomas Miller

          24   upside down --

02:44PM   25        MR. MCCONNELL:  And continues on to the west, yes,
```

1        Your Honor.

2               THE COURT:  And then there's the Joseph sovereign?

3               MR. MCCONNELL:  Right.  It encompasses much more

4        property than is involved in this lawsuit.

02:44PM  5               THE COURT:  And the Thomas Miller claim looks to be

6        uncertain according to the map.

7               MS. COLLINS:  Well --

8               THE COURT:  So if Miller is an error, then the Hodge

9        survey would go at the conjunction of -- it says it's the main

02:44PM 10        fork of San Jacinto.  This says it's the main fork of the

11        San Jacinto River on the map.

12               MR. MCCONNELL:  Well, and the Sieberman does run over

13        to the San Jacinto River on the map, it's just that the portion

14        that we're involved with is west of the river.

02:45PM 15               THE COURT:  Well, if Sovereign is wrong and Miller is

16        wrong, then you've got that little niche at the river.  You

17        don't have one of these, do you?

18               MR. MCCONNELL:  I don't have one of those, but I

19        know -- I've been living with it, so I pretty well know what

02:45PM 20        you're talking about.

21                    And, Your Honor, my point is that we don't have

22        to get into all of this because this was all resolved in the

23        state court suit and they brought a title action, trespass to

24        try title, in which they have to recover on the strength of

02:45PM 25        their own title under Rule 783, et seq.

1       THE COURT:  And common law.

2       MR. MCCONNELL:  And common law.  But they have to

3  recover -- yeah, they have to recover on the strength of their

4  own title and the Court ruled against them on that thing and

02:46PM   5  that's a final judgment now.

6            So we know that their title is no good.  Their

7  claim to title is no good because that's been adjudicated

8  against them and that ought to be -- in my mind that ought to

9  be the end of the inquiry, that you've got a final judgment,

02:46PM  10  they've lost the case, they've exhausted their appeals on the

11  case and that ought to be it.

12           And the other may be a fine academic exercise;

13  but it doesn't accomplish anything, because it's over.

14       MS. COLLINS:  Your Honor, if I might add, since you're

02:46PM  15  looking at the map...

16       THE COURT:  So this little plat?

17       MR. MCCONNELL:  It's over with respect to the

18  750.7 acres that is outlined on that tract.

19       THE COURT:  But in the southeast or lower right-hand

02:47PM  20  corner, is that in or out of --

21       MR. MCCONNELL:  No.  That's not our property.  We don't

22  have a dog in that fight.

23       THE COURT:  Okay.  So --

24       MR. MCCONNELL:  Our dog has been victorious.  We don't

02:47PM  25  care what happens to the other dogs.

1     THE COURT:  So your dog ends at the first diagonal line

2  in the corner?

3     MR. MCCONNELL:  Yeah.  Our dog ends at that -- ends at

4  that red line over to the east.  The eastern and western red

02:47PM  5  lines that run the length of the property, that's our property;

6  and that's all we're trying to claim.  That's all we're trying

7  to keep them from claiming.  All the rest of it, that's

8  somebody else's battle.

9     THE COURT:  All right.  This *McComb versus McCormack*,

02:48PM  10  where is that land?

11     MR. MCCONNELL:  That's the Fifth Circuit opinion, the

12  *McCormack* is the Fifth Circuit.

13     THE COURT:  In 1947?

14     MR. MCCONNELL:  Yes.  And that's the tract that's

02:49PM  15  outlined in red on my handout that I gave you with the two

16  parallel red lines.

17     THE COURT:  This one?

18     MR. MCCONNELL:  That one.

19     THE COURT:  And it's your client's position that the

02:51PM  20  James Hodge survey is correct?

21     MR. MCCONNELL:  Your Honor, it's our position that,

22  yes, it's correct for three reasons.

23          Number 1, it's been decided in that case.

24          Number 2, because the *stare decisis*, which was

02:51PM  25  one of the other bounds in our motion for summary judgment.

1    And Number 3, by estoppel by deed and the Court

2 granted the summary judgment without stating the reason for

3 granting it so that any of the three that are upheld are good.

4    The case was upheld on appeal and we think that

02:51PM  5 regardless of what anybody says about the 1944 judgment or the

6 1947 judgment, our judgment is still a final judgment and

7 that's the end of the inquiry.  The trial court granted

8 judgment, the case was appealed through the appellate process,

9 the case was affirmed and that's it.  And the Court was right

02:52PM 10 in its initial ruling that the case was barred by *res judicata*

11 and dismissing the case.

12    MS. COLLINS:  May I say something, Your Honor; or do I

13 need to be quiet?

14    THE COURT:  That opinion has questions that suggest

02:53PM 15 that other potential claimants to it don't have to join it.

16    MR. MCCONNELL:  That's what the Court said; but again

17 regardless of whether they agree or don't agree with what the

18 Court says, they had the ample chance to present that in the

19 state court.  They presented it, failed and we got a final

02:53PM 20 judgment and that's it.

21    THE COURT:  Somebody has been able to start a

22 collateral attack or something since 1947.

23    MR. MCCONNELL:  Well, this is the first one that we've

24 had since '47.

02:54PM 25    THE COURT:  Thanks.

1    MR. MCCONNELL:  And I think it's doomed to failure.

2    MS. COLLINS:  Your Honor, the Hodge survey is one

3    league.

4    THE COURT:  No.  We've -- I have in paper and have

02:54PM  5    heard your arguments and I will say with some humility I think

6    I understand the boundaries.

7        I had a younger sister who had two faults that

8    really bothered me.  She was prettier and nicer than I was; and

9    being the only girl, there was apparently an automatic

02:55PM  10   princessdom.  She also was self-reliant and very productive and

11   in a 20-year period of her life she bought three houses, all

12   without a survey.

13       And after each one I'd say, "Kathie, I'm not

14   going to bill you if you call me.  You know I do this stuff."

02:55PM  15       And one of them just off of Richmond, I guess,

16   had been platted in the Twenties but then apparently before it

17   got sold to the tourists and built on, the city said, "We're

18   going to condemn 13 or 14 feet off of that.  We've got to widen

19   that road."

02:56PM  20       And so they shifted to an amended plat with the

21   property lines all just 50 percent of the lot width; so she

22   didn't have Lots 5, 6 and 7.  She had the west half of 5 and

23   east half of -- and then the other two were -- that was easy

24   once you've got the plats and the person who -- the title

02:57PM  25   company of the person who sold it to her got something that

1   satisfied them that that's indeed what they had intended to

2   sell.  That's all they ever had.

3           DR. COLLINS:  Your Honor, you bring up the issue of

4   plats.  We have a plat that shows that they have the --

02:57PM   5           THE COURT:  Wait, wait, wait, wait.  May I see it?

6           DR. COLLINS:  Yes, sir.

7                Even they admitted to the existence of the

8   Sieberman at the time they had platted their property.

9           THE COURT:  That's not the problem.  He's dead.

02:57PM   10          DR. COLLINS:  So they admit to the existence of the

11  Sieberman, but now they claim it doesn't.

12          THE COURT:  What is this?

13          DR. COLLINS:  That's their plats to their subdivision.

14          MS. COLLINS:  They filed it with the county

02:58PM   15  commissioner.

16          DR. COLLINS:  They claim Sieberman doesn't exist, but

17  it does exist.

18          THE COURT:  Wait, wait.  First of all, I can't hear

19  you.  I'm trying to study this thing that apparently was built

02:58PM   20  for people with very good eyes while they were still young.

21               Has your client sold any of these lots?

22          MR. MCCONNELL:  Your Honor, we have sold some of the

23  lots.  We're being held up on the sale of the others because of

24  the pendency of this matter.

02:59PM   25          THE COURT:  There's this wide strip running east to

1  west that the east end has what I make to being a 25-degree

2  narrow angle coming back.

3      MR. MCCONNELL:  Your Honor, this was all, of course,

4  things that came into evidence at the trial court -- trial

02:59PM  5  court level and the Court ruled against them on that.  These

6  are all evidentiary matters where they would like to retry what

7  happened in the trial court, but that water is out in the Gulf

8  of Mexico long under the bridge.

9      THE COURT:  But is Foster's Ridge Section 7 being

02:59PM  10  developed?

11      MR. MCCONNELL:  Foster's Ridge Section 7 is being

12  developed now, but those are some of the lots we can't sell

13  because of this cloud that's been placed on us.

14      THE COURT:  Right.  I just wondered what that was.  Is

03:00PM  15  that a right-of-way for a future road or --

16      MR. MCCONNELL:  Well, there are road right-of-ways in

17  there; but there's also property that we can't -- we couldn't

18  get the plat approved on because of the pendency of this

19  lawsuit.

03:00PM  20      DR. COLLINS:  Your Honor, may I approach?  Maybe I can

21  see what it is.

22      THE COURT:  Pardon?

23      DR. COLLINS:  I want to see what you're describing.

24          Oh, I'm sorry.  This little diagonal down here.

03:00PM  25  This portion here is our property from -- that we own as a

```
 1   portion of the --
 2           THE COURT:  So it's not part of --
 3           DR. COLLINS:  It's not part of --
 4           THE COURT:  Whatever that line is, it's not on their
 5   land.
 6           DR. COLLINS:  Anything above the line.
 7           THE COURT:  It's a bad copy.
 8               Okay.  Return that.  Did you get a look at it?
 9           MR. MCCONNELL:  I'm familiar with that.
10               Mr. Baring, do you have anything you want to
11   contribute?
12           MR. BARING:  No, Your Honor.  I think Mr. McConnell has
13   covered it all.
14           THE COURT:  Mr. Piper?
15           MR. PIPER:  No, Your Honor.
16           THE COURT:  Mr. Dawson?
17           MR. DAWSON:  Well, Judge, I mean, I think very briefly
18   Paul knows a lot more than me.  I've lived with this for a
19   while, too.  But I think really the crux of it is in 1944, '41,
20   whatever, a court set the boundaries, the metes and bounds of
21   the property that my client, D R Horton, bought and those metes
22   and bounds boundaries stayed the same from 1941 to the present.
23               Then in 2015 when D R Horton started developing
24   it, Dr. Collins and his wife, who had lived in an adjoining
25   property, claimed for the first time that they owned part of
```

03:01PM  5

03:03PM 10

03:03PM 15

03:04PM 20

03:04PM 25

the D R Horton's property.  They said -- first they said, "We
adversely possess two acres" and got into a lawsuit.

Then in 2015, they cooked up this Sieberman
survey and, importantly, in Montgomery County they said, "We're
03:04PM  invoking this Court's equitable power to remove any cloud cast
upon Collins' title by Horton by quieting title to the subject
tract and the Sieberman survey in Collins."

That's what they asked the Court to do in
Montgomery County.  That's exactly what they're again asking
03:05PM  you to do today.  The Court listened to all of their arguments
for why they -- whether they -- not even whether they owned the
Sieberman survey.  That's never been litigated.

What the Court found was the metes and bounds of
D R Horton's property the Collins do not own title to, whether
03:05PM  by Sieberman survey, whether by adverse possession, et cetera.
The Court said, "You do not own any right, title or interest in
the land that D R Horton owns."

That was appealed vigorously to the Appellate
Court, to the Texas Supreme Court, to the United States Supreme
Court.

And so after they lost all of that, after they
invoked the district court's power, asked them and lost; so now
they have no title to D R Horton's land.

Now they're coming back, even though they don't
03:06PM  own our land, and now they're saying, "Well, wait.  We want

another bite at this because this guy fought in the revolution
and 200 years later we maybe got some quitclaims to some of his
land and so even though we don't own any of D R Horton's land,
we want this Court somehow to vacate a 75-year-old judgment
that's been recorded and been around for 75 years."

And so I'm not as eloquent or as concise as
Mr. McConnell.  I think the concise answer is *res judicata*,
because it has been -- all of this has been litigated as to the
Collins' rights to my client's property; and really that's what
we're here for today.  So I apologize for retreading ground.

THE COURT:  No, the problem is now they've added these
heirs apparent for Sieberman.

MR. DAWSON:  I don't think they're parties in this
case.

THE COURT:  No.  But they're flouting them as a defect
in your title, but that's *jus tertii*.  They can't say the poor
grand-grand-grand-grand-grandchildren of Mr. Sieberman are
being cheated.  That's not an assertion of title.

MR. DAWSON:  You're exactly right, and I think that's
why the motion to dismiss is appropriate here.

Like I said, I apologize for retreading.  You
know, it's very hard for me to come in and say nothing.

THE COURT:  You were mostly quiet.  That's another
thing they don't teach them in trial advocacy.  If you've made
a good point, shut up.

1      MR. DAWSON:  I will tell you, because my son is a
2      third-year -- he's clerking for Donato.  You're exactly right.
3      He gives these horrible trial ad stories and he comes in and
4      says, "They object to everything."
5            And I said, "Here is something you've got to
6      learn.  In the real world, don't object if it's not hurting
7      you; and if you're winning, shut up."
8            THE COURT:  That's right.
9            MR. DAWSON:  If you learn those two things, you will go
10     far.
11           THE COURT:  And if you have won, the judge has ruled,
12     leave.  Stick some cotton in your client's mouth and get him
13     out the door because something said one way or the other can
14     reopen the whole thing.
15            All right.  The history is kind of interesting.
16     Do you have a paper copy of the grant from Gonzalez?
17           MS. COLLINS:  Oh.  Do you mean into Sieberman?
18           THE COURT:  Yes.  That's the only one I know about.
19           MS. COLLINS:  Yes.  Well, I didn't bring a copy; but I
20     have a link to it.  I can provide it to the Court.
21           THE COURT:  No, it just --
22           MS. COLLINS:  I do.
23           THE COURT:  I'm a history nut.
24           MS. COLLINS:  And the grant does have -- it's all the
25     history, all the light bark paper is microfilmed, and we have

1    the actual certified copies.

2            THE COURT:  If you had one, I was going to look at it

3    just out of curiosity.

4            MS. COLLINS:  If I may just add one thing, Your Honor,

03:09PM  5    just to close it out.

6            THE COURT:  Don't whisper.

7            MS. COLLINS:  Okay.  The Hodge survey was one league.

8    The Sieberman survey was a third league.  In 1944 the Hodge

9    owners went in and did not join the Sieberman owners and got an

03:10PM 10   additional 432 acres in that lawsuit that belonged to the

11   Siebermans and we are only asking this Court today vacate the

12   1944 judgment, because only this district court under

13   Rule 60(b) can vacate it.

14           THE COURT:  Well, that I can doesn't mean I should.

03:10PM 15           MS. COLLINS:  But there's not any discretion if the

16   owners weren't joined, and the owners were not, undisputedly.

17   They didn't even argue that.  The owners undisputedly -- the

18   Sieberman owners were not joined, and they knew they existed.

19           THE COURT:  The appeal of the '44 case says that the

03:10PM 20   joinder of other claimants can't be used by you to help your

21   claim.

22           MS. COLLINS:  Only the Hodge owners were a party to

23   that suit, though.  They didn't even mention the word

24   "Sieberman" in it.

03:10PM 25           THE COURT:  And that was the problem with the cases

1    they discussed in the appeal was just that.  You don't have to
2    go hunt up the relatives who moved back to St. Louis after they
3    saw what Texas was really like.
4              MS. COLLINS:  I will add one more thing that was --
03:11PM  5              THE COURT:  They saw the first governor they elected
6    and said, "Well" --
7              MS. COLLINS:  You had "jus" -- what was the name?  You
8    had a Latin word for somebody --
9              THE COURT:  *Jus tertii*.
10              MS. COLLINS:  Okay.
11              THE COURT:  Now, if you're around a Latin teacher,
12    don't ask her how she'd pronounce it.  Don't use -- because a
13    South Texas boy's Latin is --
14              MS. COLLINS:  In that doctrine you were discussing that
03:11PM  15    you couldn't claim under someone else's -- if they lost, then
16    you lose is what you were saying, I think, if I'm interpreting
17    that correctly.
18              THE COURT:  That's right.  You can't improve your
19    standing by saying somebody else has standing.
03:11PM  20              MS. COLLINS:  Well, the Siebermans never had the
21    opportunity.  They weren't joined and so they were --
22              THE COURT:  They had -- he got his grant in 1837 -- or
23    I'm sorry.  His survivors got his grant in 1837, '38, somewhere
24    when they got around to doing the paperwork on all the heroes.
03:12PM  25    I don't know when any of these issues arose, but they have had

1    the same access to the public land records and the same access

2    to the Court records since 1837.

3         MS. COLLINS:  Right.  And so did the Hodge owners.  And

4    *Barrow versus Hunton*, which is an 18 -- you may be very

03:12PM  5    familiar with it, you've cited it in your opinion, it's an 1878

6    case -- showed that there was a party that was not joined in

7    the suit, if my understanding -- if I remember the case

8    correctly.  And his predecessor in title was Barrow and he sued

9    and they found in his case that he had the authority under the

03:12PM 10    independent action to bring the judgment -- to vacate the

11    judgments.  This was a vacatur judgment suit.  But Barrow was

12    not the original owner.  Another man was the owner, so he got

13    to come in and step in his shoes because the original owner was

14    not joined.

03:13PM 15         THE COURT:  You don't need the original owner if he's

16    not still an owner.

17         MS. COLLINS:  But the owner still is the owner.  The

18    Sieberman owners, we have an abstract coming all the way

19    forward.  They have always been the owner.  The Hodge owners

03:13PM 20    never even tried to sell the Sieberman land because they knew

21    they had more than one league and it wasn't proper.  They only

22    got a special warranty deed with no warranty at all in it.

23         THE COURT:  No, it's a special warranty, not a

24    no-warranty.

03:13PM 25         MS. COLLINS:  No, in their actual title work it said,

1    "no warranty."  It was a no-warranty deed.

2          THE COURT:  It's a special warranty.

3          MS. COLLINS:  Without warranty of any kind, so it was

4    like a quitclaim, but they didn't bring an abstract or title in

03:13PM  5    the other case because they couldn't win on a trespass to try

6    title.  We had an abstract --

7          THE COURT:  There's one on what they did have, though.

8          MS. COLLINS:  But we're not asking that the state

9    judgment be vacated.  We're asking that the 1944 judgment be

03:14PM  10   vacated because they didn't have joinder of the parties that

11   own that extra 434 acres -- 432 acres of land, the Sieberman,

12   which they recognize in their own plats today.  That's why they

13   couldn't get it approved.

14         THE COURT:  The Land Office on their map shows -- they

03:14PM  15   think Hodge probably goes down and takes the tract -- it's

16   marked as questionable for them.

17         MS. COLLINS:  Half of it was.  738 acres was.

18         THE COURT:  So all I know is a slice off the bottom of

19   the Hodge survey is marked with dashed lines instead of solid

03:14PM  20   lines to indicate "We're not sure about this."

21              But that's not a title document, ma'am.  That's

22   an index thing.

23         MS. COLLINS:  But we're asking the judge -- the Court

24   today to vacate the --

03:15PM  25         THE COURT:  No, I'm not vacating the state court

1    action.  I'm not vacating all four levels of the -- whatever

2    the name of that first one was in '44.  The '44 case.

3              MS. COLLINS:  Right.

4              THE COURT:  People who made the claim had a claim.

03:15PM   5              MS. COLLINS:  On the Hodge.

6              THE COURT:  Ma'am, Judge Kennerly looked at all of this

7    stuff and it was much simpler then because less was built on

8    all that stuff.  Montgomery County was only good for cutting

9    down pine trees for a long time and then they discovered some

03:16PM  10    oil and they became nice people.

11              We just can't every 40 years re-litigate this, I

12    don't think; but I'm going to go help the Courts of Appeals by

13    writing a modest note called an opinion, I guess.

14              MS. COLLINS:  If I might just offer one case law for

03:16PM  15    your opinion.

16              THE COURT:  Pardon?

17              MS. COLLINS:  There's just one piece -- there's a

18    Supreme Court case that may be important to your opinion.

19              THE COURT:  Speak up.

03:16PM  20              MS. COLLINS:  A Supreme Court case that may be

21    important to your opinion.

22              THE COURT:  Which Supreme Court?

23              MS. COLLINS:  Of the United States.

24              THE COURT:  Pardon?

03:16PM  25              MS. COLLINS:  The United States Supreme Court, *U.S.*

1    *versus Throckmorton* in 1878.

2          THE COURT:  Well, I'm not familiar with it, but I like

3    old stuff.

4          MS. COLLINS:  It's a case that had to do with a land

03:17PM  5    patent, and the U.S. Supreme Court said in that case that only

6    the General Land Office had the authority and had to be

7    involved in the case as party to change the actual records of

8    the land department of the state.

9          Here the General Land Office didn't have to

03:17PM  10   change anything because no one ever even brought them into it.

11   The General Land Office records --

12         THE COURT:  All right.  Ma'am, there was no federal

13   land in Texas.

14         MS. COLLINS:  No.  This is a federal case though.

03:17PM  15   THE COURT:  This is -- Texas public land was part of

16   our deal.  We traded Denver and Santa Fe and a few other

17   useless odds and ends for them paying off our national debt,

18   but we kept our public lands.  It's in the treaty, ma'am.

19         MS. COLLINS:  Right.  But the Land Office is the one in

03:17PM  20   this U.S. Supreme Court case that has to be involved when their

21   patents are tampered with, according to --

22         THE COURT:  There's not a federal patent here.

23         MS. COLLINS:  No, no, state patent.  This was a state

24   land patent.  This case said, "We're not touching a state land

03:18PM  25   patent unless the state Land Office has given you authority or

1    was there to assert that our patent was wrong."

2          That never happened because had the 1944 parties

3    brought the General Land Office into Sieberman, they would have

4    shown that the Hodge was only one league and the Sieberman was

03:18PM    5    being usurped because the owners weren't there.  That's why

6    they weren't brought in.

7          THE COURT:  Mr. Dawson, are you that devious?

8          MR. DAWSON:  That was -- I think even my dad, Judge --

9    my father was just born.  I wasn't around.  So if we got in our

03:19PM   10    time capsule and went back in our time machine -- it's an

11    apples-and-oranges.  If you take what she's telling you, every

12    case involving land, you would have to involve the General Land

13    Office.

14          We're not trying to change the patent.  We have a

03:19PM   15    judgment that says, "We own this land.  Here is the metes and

16    bounds.  You've owned it almost" -- it'll be almost 80 years

17    now.

18          MS. COLLINS:  They claim the patent didn't exist.

19          THE COURT:  Ma'am, I've never held a lawyer in

03:19PM   20    contempt, never even threatened it; but I may have shot one or

21    two.  Stop interrupting people.

22          MR. DAWSON:  The short answer, Judge, is no, we're not

23    that devious.

24          THE COURT:  Would you write that citation down.

03:19PM   25          MS. COLLINS:  I beg your pardon?

1          THE COURT:  Would you write the citation for me,

2    please.

3          MS. COLLINS:  Yes.

4          THE COURT:  Were you old enough to have practiced

03:20PM  5    before Ernest Coker?

6          MR. MCCONNELL:  I did practice in front of Judge Coker

7    and I was -- as you were coming in and they do the big thud on

8    the door, it reminded me Jess Holliman was the judge of the 2nd

9    Ninth there and he about gave me a heart attack one day.  I was

03:20PM  10   cross-examining a witness and I'm looking over here at the jury

11   box with my back turned to him and noon comes and he dropped

12   that gavel down and I jumped about 2 feet in the air.

13         THE COURT:  He would also take calls from his wife.  He

14   had that light bulb on his desk and it would start blinking and

03:21PM  15   he would just growl and bark at her.

16         But I never won a trial before Judge Coker, and I

17   never lost the appeal in Beaumont.  My associates would say,

18   "Oh, this is terrible."

19         I said, "No, it's not.  You try something before

03:21PM  20   Pete Salino and some of the people back in those days, they're

21   sensible and you can just sort of casually go about it and stay

22   in the rules and all; but you get before some judges and you

23   follow each step.  You have you a printed form of the

24   business -- of the business records.  You can't just ask a

03:22PM  25   normal question.  You've got to ask each question so it's a

1  good refresher in the rules and the core.  It's not a lot of

2  fun, but you need refreshing occasionally.

3          And then I sued the county once and the county

4  judge was Lynn Coker and the judge -- I didn't win that one.

03:22PM  5          MR. MCCONNELL:  It's funny, Your Honor, because that

6  has changed so much now, because, you know, you feel from there

7  to Beaumont and now the Beaumont Court of Appeals, which used

8  to be all Democrats is now all Republican lawyers from

9  The Woodlands because that district is now ruled by

03:22PM  10  The Woodlands.

11          THE COURT:  And they had some good judges.

12          MR. MCCONNELL:  They had some good judges.

13          THE COURT:  A congressman's -- the son of a prominent

14  Texas -- I'm drawing a blank on what either one of their names

03:23PM  15  was, but it was like something the third.

16          MR. DAWSON:  Furgeson?  Lynn Walker?

17          MR. MCCONNELL:  Not Dewey Gonsoulin?

18          THE COURT:  Actually if you said it, I'm not sure I

19  could remember.  It's mercifully been a long time.  There was a

03:23PM  20  powerful lawyer there.  I cannot think of the name.

21          Lester Goodson was my wife's step-grandfather and

22  so we went up there once in a while.  I never met him, but his

23  widow survived him by a number of years.

24          I went to Camp Strake.  The Boy Scouts had better

03:24PM  25  water moccasins than any other Boy Scout camp in America.

1          MR. MCCONNELL:  That's now a subdivision.

2          MR. DAWSON:  That was a great camp.  I went there.

3          MR. MCCONNELL:  Larry Johnson did that.  He bought

4     that.

03:24PM  5          THE COURT:  At the time I still thought it was cool.

6     You know, I was away from home and the fact that you had to

7     have a flashlight to go to the latrine because there would be a

8     snake or something in there.  It had its challenges.

9               All right.  Thank you.  I'll get to this as soon

03:24PM 10     as humanly possible.

11          MR. MCCONNELL:  Thank you, Your Honor.

12               (The proceedings were adjourned.)

13                         *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2            I, Lanie M. Smith, CSR, RMR, CRR, Official
Court Reporter, United States District Court, Southern District

3  of Texas, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and

4  understanding, from the record of the proceedings in the
above-entitled and numbered matter.

5

6                               /s/ Lanie M. Smith

7                            Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'35** [1] - 35:7
**'38** [1] - 52:23
**'41** [2] - 38:12, 47:19
**'44** [12] - 3:19, 3:25, 9:10, 12:23, 37:6, 37:7, 37:13, 38:13, 39:10, 51:19, 55:2
**'47** [3] - 13:5, 38:13, 43:24
**'48** [1] - 4:1

**/**

**/s** [1] - 61:6

**1**

**1** [1] - 42:23
**11054** [1] - 1:15
**1177** [1] - 1:19
**12** [1] - 17:9
**12-year** [1] - 16:22
**1200-and-some-odd** [1] - 5:24
**1209** [2] - 9:6, 9:7
**13** [1] - 44:18
**14** [1] - 44:18
**1700** [1] - 1:20
**18** [1] - 53:4
**180** [1] - 31:15
**1836** [2] - 24:14, 35:7
**1837** [3] - 52:22, 52:23, 53:2
**1857** [1] - 32:9
**1858** [1] - 32:8
**1878** [3] - 32:9, 53:5, 56:1
**19** [1] - 25:8
**1940-something** [1] - 33:3
**1941** [3] - 29:9, 29:16, 47:22
**1942** [1] - 35:25
**1944** [36] - 3:7, 3:21, 4:8, 5:6, 5:13, 9:1, 9:4, 10:23, 11:8, 11:12, 11:23, 18:16, 18:25, 20:23, 20:25, 26:22, 27:1, 27:19, 27:21, 27:24, 29:1, 29:2, 30:4, 30:20, 32:12, 38:16, 38:18, 38:20, 39:15, 39:20, 43:5, 47:19, 51:8, 51:12, 54:9, 57:2
**1947** [3] - 42:13, 43:6, 43:22
**1978** [1] - 16:8

**2**

**2** [3] - 3:14, 42:24, 58:12
**20** [1] - 3:14
**20-year** [1] - 44:11
**200** [1] - 49:2
**2015** [7] - 12:16, 22:14, 22:25, 23:22, 37:4, 47:23, 48:3
**2016** [4] - 12:15, 12:16, 23:1, 23:23
**2021** [1] - 1:7
**25-degree** [1] - 46:1
**284th** [1] - 19:8
**2:00** [1] - 20:3

**2nd** [1] - 58:8

**3**

**3** [2] - 1:7, 43:1
**3,000** [1] - 31:10

**4**

**40** [3] - 8:24, 55:11
**40-acre** [1] - 8:20
**42** [1] - 6:16
**432** [4] - 11:10, 33:25, 51:10, 54:11
**432-acre** [1] - 11:11
**434** [1] - 54:11
**45** [1] - 4:17
**4:20-CV-01897** [1] - 1:4

**5**

**5** [2] - 44:22
**50** [1] - 44:21
**515** [1] - 2:3

**6**

**6** [2] - 29:9, 44:22
**60** [1] - 19:20, 27:19, 28:7, 28:9
**60(b** [4] - 18:1, 18:9, 18:10, 51:13
**600** [1] - 1:23

**7**

**7** [4] - 6:4, 44:22, 46:9, 46:11
**738** [1] - 54:17
**743** [1] - 8:21
**75** [1] - 49:5
**75-year-old** [1] - 49:4
**750** [2] - 6:2, 6:3
**750-acre** [3] - 6:7, 6:11, 10:1
**750.7** [1] - 41:18
**770** [1] - 1:22
**77002** [1] - 2:4
**77027** [1] - 1:20
**77056** [1] - 1:23
**77384** [1] - 1:15
**783** [1] - 40:25
**7th** [3] - 29:10, 29:13, 29:16

**8**

**80** [1] - 57:16
**8004** [1] - 2:3
**8th** [1] - 29:18

**A**

**ability** [1] - 61:3
**able** [3] - 22:7, 31:17, 43:21
**above-entitled** [1] - 61:4

**abstract** [9] - 20:18, 20:20, 24:9, 24:13, 25:1, 25:19, 53:18, 54:4, 54:6
**abutted** [1] - 21:15
**academic** [1] - 41:12
**accepted** [1] - 27:1
**access** [2] - 53:1
**accomplish** [1] - 41:13
**according** [4] - 5:15, 18:21, 40:6, 56:21
**accurate** [1] - 14:21
**acknowledge** [1] - 13:24
**acquire** [1] - 13:22
**acquired** [3] - 22:10, 22:11, 25:10
**acre** [1] - 11:13
**acreage** [1] - 11:12
**acres** [19] - 5:24, 6:3, 6:16, 8:21, 8:23, 8:24, 9:6, 9:7, 9:8, 11:10, 31:10, 33:25, 41:18, 48:2, 51:10, 54:11, 54:17
**action** [9] - 4:11, 16:10, 17:13, 18:12, 23:9, 23:11, 40:23, 53:10, 55:1
**actions** [1] - 16:5
**actual** [10] - 11:2, 11:5, 25:18, 35:1, 35:3, 35:14, 36:4, 51:1, 53:25, 56:7
**ad** [1] - 50:3
**add** [3] - 41:14, 51:4, 52:4
**added** [2] - 32:18, 49:11
**additional** [2] - 11:11, 51:10
**address** [1] - 18:18
**adherence** [1] - 16:6
**adjoining** [1] - 47:24
**adjourned** [1] - 60:12
**adjudicated** [6] - 9:1, 9:3, 9:20, 10:11, 12:1, 41:7
**adjust** [1] - 12:10
**adjusted** [1] - 19:5
**admit** [1] - 45:10
**admitted** [1] - 45:7
**adverse** [4] - 23:5, 27:9, 27:11, 48:15
**adversely** [4] - 7:14, 7:23, 12:2, 48:2
**advocacy** [1] - 49:24
**affidavits** [1] - 25:3
**affirmed** [2] - 38:13, 43:9
**afraid** [2] - 31:4
**ago** [3] - 13:6, 17:18, 33:12
**agree** [2] - 43:17
**agreement** [5] - 16:18, 16:20, 16:22, 16:24, 17:2
**air** [3] - 5:2, 20:13, 58:12
**air-conditioning** [2] - 5:2, 20:13
**almost** [2] - 57:16
**amazed** [1] - 31:8
**amended** [2] - 23:23, 44:20
**America** [1] - 59:25
**amount** [1] - 11:11
**ample** [1] - 43:18
**angle** [1] - 46:2
**answer** [4] - 15:20, 35:5, 49:7, 57:22
**anyway** [1] - 23:20
**apologize** [3] - 26:8, 49:10, 49:21

**apparent** [1] - 49:12
**appeal** [8] - 3:23, 9:16, 37:19, 38:13, 43:4, 51:19, 52:1, 58:17
**appealed** [6] - 9:15, 12:18, 12:20, 37:18, 43:8, 48:18
**Appeals** [2] - 55:12, 59:7
**appeals** [1] - 41:10
**appearance** [1] - 20:2
**APPEARANCES** [1] - 1:13
**appellate** [3] - 19:9, 34:2, 43:8
**Appellate** [1] - 48:18
**apples** [1] - 57:11
**apples-and-oranges** [1] - 57:11
**appoint** [1] - 38:11
**appointed** [1] - 38:10
**approach** [2] - 3:11, 46:20
**appropriate** [1] - 49:20
**approved** [2] - 46:18, 54:13
**Archibald** [2] - 39:4, 39:22
**Archives** [1] - 14:1
**area** [2] - 8:17, 30:19
**argue** [3] - 17:3, 24:24, 51:17
**arguing** [1] - 11:7
**arguments** [2] - 44:5, 48:10
**arose** [1] - 52:25
**ashamed** [1] - 31:5
**assert** [1] - 57:1
**assertion** [1] - 49:18
**associates** [1] - 58:17
**assume** [1] - 3:3
**Astros** [1] - 23:18
**attack** [2] - 43:22, 58:9
**attention** [1] - 15:12
**attorney** [1] - 24:10
**authenticity** [1] - 29:6
**authority** [6] - 26:23, 27:1, 27:23, 53:9, 56:6, 56:25
**automatic** [1] - 44:9
**awarded** [1] - 24:5
**aware** [1] - 38:1

**B**

**backfilling** [1] - 23:8
**bad** [3] - 28:5, 34:4, 47:7
**bad-mouth** [1] - 34:4
**Bankers** [1] - 18:14
**Baring** [2] - 4:14, 47:10
**BARING** [2] - 1:17, 47:12
**bark** [2] - 50:25, 58:15
**barred** [1] - 43:10
**Barrow** [3] - 53:4, 53:8, 53:11
**base** [1] - 28:18
**based** [2] - 26:21, 27:2, 37:15
**basis** [4] - 18:22, 27:24, 28:11, 28:25
**battle** [1] - 42:8
**Battle** [2] - 24:4, 25:7
**Beaumont** [3] - 58:17, 59:7
**became** [2] - 19:3, 55:10

**become** [1] - 20:23
**BEFORE** [1] - 1:10
**beg** [1] - 57:25
**Beggerly** [4] - 16:3, 16:8, 16:14, 16:16
**beginning** [1] - 24:14
**belong** [1] - 8:19
**belonged** [1] - 51:10
**Ben** [1] - 12:24
**BEN** [1] - 1:17
**bench** [1] - 14:3
**benchmarks** [1] - 14:7
**beneath** [1] - 39:3
**best** [1] - 61:3
**better** [5] - 12:9, 25:2, 27:22, 28:22, 59:24
**bias** [1] - 24:11
**bibles** [1] - 25:4
**big** [9] - 5:6, 5:20, 6:19, 6:20, 6:21, 6:22, 13:17, 22:18, 58:7
**bill** [1] - 44:14
**bit** [1] - 4:19
**bite** [1] - 49:1
**black** [4] - 5:10, 5:11, 5:12
**blank** [1] - 59:14
**blinking** [1] - 58:14
**block** [1] - 21:16
**books** [1] - 21:23
**born** [3] - 13:6, 13:7, 57:9
**bothered** [1] - 44:8
**bottom** [2] - 39:2, 54:18
**bought** [10] - 5:8, 5:14, 10:2, 14:14, 20:25, 33:18, 38:17, 44:11, 47:21, 60:3
**boundaries** [3] - 44:6, 47:20, 47:22
**boundary** [4] - 6:10, 11:2, 34:17, 38:19
**bounds** [18] - 4:3, 4:8, 30:11, 30:16, 30:18, 30:25, 31:1, 31:8, 31:13, 38:1, 38:2, 38:6, 39:15, 42:25, 47:20, 47:22, 48:13, 57:16
**box** [1] - 58:11
**Boy** [2] - 59:24, 59:25
**boy's** [1] - 52:13
**Boyles** [1] - 30:2
**branch** [1] - 21:18
**bridge** [1] - 46:8
**brief** [1] - 15:12
**briefly** [1] - 47:17
**bring** [8] - 12:11, 15:12, 24:25, 32:14, 45:3, 50:19, 53:10, 54:4
**bringing** [1] - 11:24
**brought** [21] - 9:1, 9:13, 11:24, 13:19, 14:5, 14:6, 14:23, 14:24, 15:2, 16:11, 17:6, 17:14, 17:24, 20:24, 26:14, 36:2, 40:23, 56:10, 57:3, 57:6
**building** [1] - 21:18
**built** [3] - 44:17, 45:19, 55:7
**bulb** [1] - 58:14
**bunch** [2] - 7:4, 37:21
**business** [2] - 58:24
**buy** [1] - 33:19

**C**

**Camp** [1] - 59:24
**camp** [2] - 59:25, 60:2
**cannot** [1] - 59:20
**capsule** [1] - 57:10
**care** [6] - 10:2, 14:12, 15:2, 31:5, 35:19, 41:25
**CARL** [1] - 1:21
**case** [69] - 4:12, 7:2, 7:3, 8:10, 9:4, 9:11, 9:12, 9:15, 9:20, 9:22, 15:14, 16:3, 16:13, 16:16, 17:3, 17:17, 17:18, 17:19, 24:24, 26:13, 26:14, 26:24, 26:25, 27:17, 27:18, 27:19, 27:21, 27:22, 29:9, 30:4, 30:20, 31:2, 31:10, 31:11, 37:6, 37:7, 37:9, 37:13, 37:16, 38:12, 39:13, 41:10, 41:11, 42:23, 43:4, 43:8, 43:9, 43:10, 43:11, 49:14, 51:19, 53:6, 53:7, 53:9, 54:5, 55:2, 55:14, 55:18, 55:20, 56:4, 56:5, 56:7, 56:14, 56:20, 56:24, 57:12
**cases** [3] - 18:15, 38:10, 51:25
**cast** [1] - 48:5
**casually** [1] - 58:21
**center** [1] - 19:25
**CERTIFICATE** [1] - 61:1
**certified** [2] - 6:12, 51:1
**certify** [1] - 61:3
**certiorari** [1] - 9:19
**cetera** [1] - 48:15
**chain** [5] - 21:2, 22:10, 22:12, 23:12, 23:2
**challenges** [1] - 60:8
**chance** [1] - 43:18
**change** [3] - 56:7, 56:10, 57:14
**changed** [1] - 59:6
**cheated** [1] - 49:18
**childhood** [1] - 21:23
**Circuit** [5] - 3:22, 13:5, 37:18, 42:11, 42:12
**citation** [2] - 57:24, 58:1
**cited** [1] - 53:5
**citizenship** [1] - 37:15
**city** [3] - 19:25, 39:13, 44:17
**claim** [26] - 6:6, 6:23, 6:25, 10:5, 10:8, 19:11, 23:5, 23:15, 24:7, 27:11, 27:25, 28:18, 28:19, 28:23, 29:1, 40:5, 41:7, 42:6, 45:11, 45:16, 51:21, 52:15, 55:4, 57:18
**claimants** [2] - 43:15, 51:20
**claimed** [3] - 8:6, 31:18, 47:25
**claiming** [13] - 6:11, 8:6, 9:13, 10:12, 11:3, 12:17, 23:2, 23:13, 35:25, 36:8, 39:8, 39:9, 42:7
**claims** [1] - 28:12
**clarify** [1] - 13:15
**clear** [1] - 4:18
**clearly** [1] - 38:20
**CLERK** [1] - 20:8

**clerking** [1] - 50:2
**client** [3] - 11:14, 45:21, 47:21
**client's** [3] - 42:19, 49:9, 50:12
**clients** [1] - 22:15
**clock** [1] - 3:13
**close** [2] - 8:18, 51:5
**closer** [2] - 7:24
**cloud** [2] - 46:13, 48:5
**coastal** [1] - 31:14
**Cochran** [2] - 37:9, 37:13
**Coker** [4] - 58:5, 58:6, 58:16, 59:4
**collateral** [1] - 43:22
**collection** [1] - 36:11
**Collins** [21] - 6:6, 6:11, 9:13, 10:11, 19:10, 22:9, 22:21, 22:24, 23:12, 24:4, 25:10, 25:12, 25:13, 26:24, 27:22, 38:17, 39:8, 39:9, 47:24, 48:7, 48:14
**COLLINS** [171] - 1:4, 1:14, 6:12, 6:25, 7:13, 7:17, 8:8, 8:13, 8:16, 8:24, 10:19, 11:16, 11:20, 12:4, 13:12, 13:15, 13:19, 15:4, 15:9, 15:11, 15:16, 15:19, 15:22, 15:24, 16:3, 16:10, 16:14, 16:16, 17:20, 18:3, 18:7, 18:9, 18:21, 18:25, 19:4, 19:8, 19:15, 19:18, 24:9, 24:18, 24:22, 25:8, 25:15, 25:17, 25:19, 25:21, 26:1, 26:5, 26:7, 26:12, 26:16, 26:20, 27:11, 27:13, 27:14, 27:16, 28:3, 28:6, 28:11, 28:16, 28:20, 28:23, 28:25, 29:4, 29:9, 29:13, 29:16, 29:19, 30:1, 30:3, 30:6, 30:7, 30:9, 30:11, 30:15, 30:18, 31:2, 31:19, 31:21, 31:23, 31:24, 32:1, 32:5, 32:9, 32:13, 32:16, 32:18, 33:2, 33:6, 33:8, 33:9, 33:10, 33:11, 33:15, 33:20, 33:22, 34:5, 34:7, 34:8, 34:9, 34:10, 34:15, 34:19, 34:20, 34:22, 34:25, 35:8, 35:11, 35:14, 35:17, 35:18, 35:23, 36:4, 36:6, 36:7, 36:12, 36:13, 36:16, 36:19, 36:20, 36:21, 36:22, 39:17, 40:7, 41:14, 43:12, 44:2, 45:3, 45:6, 45:10, 45:13, 45:14, 45:16, 46:20, 46:23, 47:3, 47:6, 50:17, 50:19, 50:22, 50:24, 51:4, 51:7, 51:15, 51:22, 52:4, 52:7, 52:10, 52:14, 52:20, 53:3, 53:17, 53:25, 54:3, 54:8, 54:17, 54:23, 55:3, 55:5, 55:14, 55:17, 55:20, 55:23, 55:25, 56:4, 56:14, 56:19, 56:23, 57:18, 57:25, 58:3
**Collins'** [2] - 48:6, 49:9
**coming** [5] - 16:24, 46:2, 48:24, 53:18, 58:7
**commissioner** [1] - 45:15
**common** [2] - 41:1, 41:2
**company** [1] - 44:25
**Company** [2] - 37:10, 37:13
**competent** [1] - 19:19
**complicated** [2] - 15:10, 27:15
**computer** [2] - 1:25, 31:12
**concise** [2] - 49:6, 49:7
**conclusion** [1] - 35:5
**condemn** [1] - 44:18
**conditioning** [2] - 5:2, 20:13

**confirm** [1] - 14:7
**conflict** [2] - 34:10, 35:3
**congressman's** [1] - 59:13
**conjunction** [1] - 40:9
**Conroe** [3] - 1:15, 21:4, 32:25
**constructive** [1] - 38:21
**contempt** [1] - 57:20
**contended** [1] - 23:3
**contest** [4] - 11:14, 16:23, 18:24, 19:2
**contested** [2] - 19:1, 19:4
**continuation** [2] - 17:25, 27:18
**continues** [1] - 39:25
**contribute** [1] - 47:11
**controls** [1] - 38:2
**conveyed** [2] - 38:14, 38:15
**cooked** [1] - 48:3
**cool** [1] - 60:5
**copied** [1] - 5:11
**copies** [1] - 51:1
**copy** [4] - 6:12, 47:7, 50:16, 50:19
**core** [1] - 59:1
**corner** [4] - 5:16, 6:16, 41:20, 42:2
**correct** [6] - 29:19, 34:2, 39:5, 42:20, 42:22, 61:3
**correctly** [2] - 52:17, 53:8
**correctness** [1] - 29:7
**cost** [1] - 22:3
**cotton** [1] - 50:12
**counterclaim** [3] - 12:12, 12:16, 23:1
**counteroffer** [1] - 22:5
**County** [6] - 7:6, 21:12, 21:17, 48:4, 48:9, 55:8
**county** [3] - 45:14, 59:3
**couple** [1] - 26:5
**course** [3] - 29:10, 37:5, 46:3
**Court** [53] - 2:1, 2:1, 2:2, 3:17, 3:21, 5:5, 8:1, 8:4, 9:16, 9:17, 9:18, 9:19, 28:7, 30:12, 36:17, 38:1, 38:2, 41:4, 43:1, 43:9, 43:16, 43:18, 46:5, 48:8, 48:10, 48:13, 48:16, 48:19, 48:20, 49:4, 50:20, 51:11, 53:2, 54:23, 55:18, 55:20, 55:22, 55:25, 56:5, 56:20, 59:7, 61:2, 61:6
**COURT** [221] - 1:1, 3:2, 3:6, 3:9, 3:12, 3:18, 3:20, 3:24, 4:6, 4:13, 4:24, 5:9, 5:15, 5:22, 6:1, 6:4, 6:8, 6:15, 6:20, 6:23, 7:4, 7:15, 8:5, 8:12, 8:14, 8:23, 9:23, 10:5, 10:13, 10:16, 11:14, 11:17, 12:7, 12:9, 12:14, 12:18, 12:23, 13:2, 13:7, 13:14, 13:17, 15:2, 15:6, 15:10, 15:15, 15:17, 15:20, 15:23, 15:25, 16:9, 16:12, 16:15, 17:19, 18:2, 18:4, 18:8, 18:19, 18:23, 19:2, 19:7, 19:14, 19:16, 19:21, 19:25, 20:5, 20:10, 20:13, 20:16, 20:22, 21:1, 21:5, 21:7, 21:11, 22:13, 23:7, 23:12, 23:25, 24:17, 24:20, 25:6, 25:14, 25:16, 25:22, 26:6, 26:9, 26:15, 26:18, 27:9, 27:12, 27:15, 28:2, 28:4, 28:10, 28:15, 28:17, 28:21, 28:24,

29:3, 29:8, 29:12, 29:15, 29:17, 29:24, 30:8, 30:10, 30:14, 30:16, 30:23, 31:3, 31:20, 31:22, 31:25, 32:3, 32:11, 32:15, 32:25, 33:4, 33:7, 33:13, 33:18, 33:21, 34:3, 34:6, 34:11, 34:13, 34:16, 34:23, 35:4, 35:10, 35:19, 36:3, 36:10, 36:14, 36:18, 36:24, 37:2, 37:5, 37:11, 37:20, 37:24, 38:4, 38:24, 39:7, 39:13, 39:21, 40:2, 40:5, 40:8, 40:15, 41:1, 41:16, 41:19, 41:23, 42:1, 42:9, 42:13, 42:17, 42:19, 43:14, 43:21, 43:25, 44:4, 45:5, 45:9, 45:12, 45:18, 45:25, 46:9, 46:14, 46:22, 47:2, 47:4, 47:7, 47:14, 47:16, 49:11, 49:15, 49:23, 50:8, 50:11, 50:18, 50:21, 50:23, 51:2, 51:6, 51:14, 51:19, 51:25, 52:5, 52:9, 52:11, 52:18, 52:22, 53:15, 53:23, 54:2, 54:7, 54:14, 54:18, 54:25, 55:4, 55:6, 55:16, 55:19, 55:22, 55:24, 56:2, 56:12, 56:15, 56:22, 57:7, 57:19, 57:24, 58:1, 58:4, 58:13, 59:11, 59:13, 59:18, 60:5
**court** [52] - 3:7, 3:20, 4:11, 6:2, 7:19, 7:21, 8:1, 8:2, 8:11, 9:3, 9:11, 9:12, 10:10, 11:25, 12:5, 12:12, 16:4, 16:11, 17:6, 17:7, 17:24, 18:5, 18:11, 18:12, 18:17, 19:1, 19:7, 19:19, 26:17, 26:20, 26:22, 26:23, 27:6, 27:20, 27:23, 28:9, 29:22, 37:9, 37:14, 37:15, 38:23, 40:23, 43:7, 43:19, 46:4, 46:5, 46:7, 47:20, 51:12, 54:25
**Court's** [2] - 15:12, 48:5
**court's** [2] - 3:17, 48:22
**Courts** [1] - 55:12
**covered** [6] - 7:1, 9:23, 9:24, 11:2, 33:24, 47:13
**covers** [1] - 33:25
**create** [3] - 24:13, 25:19, 31:1
**created** [2] - 14:18, 24:12
**Creek** [1] - 39:1
**creek** [1] - 39:18
**crew** [1] - 22:16
**cross** [1] - 58:10
**cross-examining** [1] - 58:10
**crowd** [1] - 20:6
**CRR** [2] - 2:1, 61:2
**crux** [1] - 47:19
**CSR** [2] - 2:1, 61:2
**cumulative** [1] - 31:16
**curiosity** [1] - 51:3
**current** [1] - 25:4
**cutting** [1] - 55:8

**D**

**dad** [1] - 57:8
**dashed** [1] - 54:19
**date** [2] - 12:14, 24:15
**David** [2] - 10:6, 10:9, 11:18
**DAWSON** [13] - 1:21, 4:17, 4:21, 19:24, 47:17, 49:13, 49:19, 50:1, 50:9,

57:8, 57:22, 59:16, 60:2
**Dawson** [5] - 1:22, 4:16, 19:22, 47:16, 57:7
**days** [1] - 58:20
**dead** [1] - 45:9
**deal** [1] - 56:16
**debatable** [1] - 28:24
**debate** [2] - 29:6
**debt** [1] - 56:17
**December** [4] - 29:9, 29:10, 29:13, 29:16
**decided** [2] - 37:16, 42:23
**decisions** [1] - 38:2
**decisis** [1] - 42:24
**deed** [7] - 14:17, 14:18, 14:19, 23:4, 43:1, 53:22, 54:1
**deeds** [1] - 23:21
**deemed** [2] - 8:2, 39:10
**defect** [1] - 49:15
**defective** [1] - 28:18
**defendant** [1] - 15:21
**DEFENDANT** [1] - 1:17
**DeLange** [1] - 1:18
**delineate** [1] - 31:8
**Democrats** [1] - 59:8
**denied** [3] - 9:17, 9:19, 19:17
**Denver** [1] - 56:16
**department** [1] - 56:8
**departure** [1] - 16:6
**derivative** [1] - 32:5
**describe** [1] - 38:6
**described** [3] - 14:18, 14:19, 37:25
**describing** [1] - 46:23
**desk** [1] - 58:14
**detail** [2] - 30:3, 30:4
**determine** [1] - 17:9
**determined** [2] - 8:19, 11:23
**determining** [1] - 37:22
**developed** [2] - 46:10, 46:12
**developing** [1] - 47:23
**devious** [2] - 57:7, 57:23
**Dewey** [1] - 59:17
**diagonal** [2] - 42:1, 46:24
**different** [1] - 35:24
**difficult** [2] - 29:4, 29:5
**digress** [1] - 28:6
**discovered** [2] - 14:16, 55:9
**discovery** [3] - 17:4, 17:12, 36:7
**discretion** [1] - 51:15
**discussed** [1] - 52:1
**discussing** [1] - 52:14
**dismiss** [1] - 49:20
**dismissed** [1] - 9:22
**dismissing** [1] - 43:11
**dispute** [4] - 4:10, 28:14, 29:21, 36:21
**disregard** [1] - 38:7
**District** [4] - 2:2, 2:2, 61:2
**district** [5] - 17:6, 18:12, 48:22, 51:12, 59:9

**DISTRICT** [3] - 1:1, 1:1, 1:10
**diversity** [1] - 37:15
**DIVISION** [1] - 1:2
**division** [1] - 38:11
**doctor** [1] - 30:23
**doctrine** [1] - 52:14
**document** [1] - 54:21
**dog** [5] - 10:3, 41:22, 41:24, 42:1, 42:3
**dogs** [1] - 41:25
**domesticity** [1] - 25:23
**Donato** [1] - 50:2
**done** [6] - 3:25, 24:8, 32:7, 35:2, 38:12
**doomed** [1] - 44:1
**door** [2] - 50:13, 58:8
**dory** [1] - 13:8
**down** [13] - 14:20, 19:21, 21:1, 26:8, 36:24, 38:25, 39:12, 39:24, 46:24, 54:15, 55:9, 57:24, 58:12
**Dr** [10] - 9:13, 10:11, 22:9, 22:21, 22:23, 23:12, 38:17, 39:8, 39:9, 47:24
**DR** [62] - 25:17, 25:21, 26:1, 26:5, 26:7, 26:12, 26:16, 26:20, 27:11, 27:14, 27:16, 28:3, 28:6, 28:11, 28:16, 28:20, 28:23, 28:25, 29:4, 29:9, 29:13, 29:16, 29:19, 30:1, 30:6, 30:9, 30:11, 30:15, 30:18, 31:2, 31:19, 31:21, 31:24, 32:1, 32:5, 32:13, 32:18, 33:2, 33:6, 33:8, 33:10, 33:15, 34:7, 34:9, 34:20, 34:25, 35:8, 35:11, 35:17, 36:6, 36:13, 36:20, 36:22, 45:3, 45:6, 45:10, 45:13, 45:16, 46:20, 46:23, 47:3, 47:6
**drawing** [1] - 59:14
**dropped** [1] - 58:11
**Dugat** [2] - 8:7, 8:16

**E**

**early** [2] - 21:23, 23:23
**easements** [1] - 38:15
**east** [8] - 7:11, 7:24, 8:17, 39:19, 42:4, 44:23, 45:25, 46:1
**eastern** [1] - 42:4
**easy** [1] - 44:23
**eat** [1] - 3:15
**effect** [1] - 11:4
**either** [3] - 27:12, 35:15, 59:14
**elected** [1] - 52:5
**electric** [1] - 4:4
**electronic** [1] - 31:16
**eloquent** [1] - 49:6
**encompasses** [1] - 40:3
**end** [5] - 23:22, 35:5, 41:9, 43:7, 46:1
**ends** [4] - 42:1, 42:3, 56:17
**enlarged** [1] - 10:23
**entered** [7] - 16:18, 16:19, 17:2, 17:15, 18:13, 29:10, 37:16
**entire** [10] - 7:1, 7:20, 8:3, 9:5, 14:2, 14:19, 27:2, 28:25, 29:21, 30:5
**entitled** [1] - 61:4
**equitable** [2] - 38:11, 48:5

**equivalent** [1] - 27:19
**era** [1] - 4:3
**Ernest** [1] - 58:5
**error** [3] - 17:23, 31:16, 40:8
**essentially** [3] - 7:8, 10:5, 27:18
**estoppel** [1] - 43:1
**et** [2] - 40:25, 48:15
**Evans** [1] - 25:11
**eventually** [2] - 22:21, 25:10
**evidence** [2] - 26:21, 46:4
**evidentiary** [1] - 46:6
**exactly** [4] - 32:13, 48:9, 49:19, 50:2
**examining** [1] - 58:10
**exception** [2] - 16:7, 17:13
**exceptions** [1] - 18:8
**exercise** [1] - 41:12
**exhausted** [1] - 41:10
**exist** [4] - 8:2, 45:16, 45:17, 57:18
**existed** [4] - 14:10, 17:10, 32:11, 51:18
**existence** [2] - 45:7, 45:10
**exists** [1] - 35:2
**explain** [1] - 26:18
**expressly** [1] - 19:16
**extinguishing** [1] - 11:5
**extra** [3] - 4:14, 32:18, 54:11
**eyes** [1] - 45:20

**F**

**face** [2] - 27:1, 27:3
**fact** [3] - 28:4, 38:17, 60:6
**facts** [3] - 16:9, 16:13, 16:14
**failed** [1] - 43:19
**failure** [1] - 44:1
**familiar** [4] - 47:9, 53:5, 56:2
**family** [5] - 21:3, 21:4, 21:9, 23:19, 23:20
**far** [1] - 50:10
**farm** [1] - 5:1
**faster** [1] - 4:22
**father** [3] - 25:9, 32:2, 57:9
**faults** [1] - 44:7
**favor** [3] - 10:11, 17:10, 27:2
**Fe** [1] - 56:16
**FEBRUARY** [1] - 1:7
**federal** [9] - 7:2, 7:21, 12:23, 18:5, 29:22, 37:15, 56:12, 56:14, 56:22
**Federal** [1] - 14:1
**feet** [4] - 6:10, 31:15, 44:18, 58:12
**fence** [1] - 22:21
**few** [4] - 8:17, 13:15, 15:11, 56:16
**fiat** [1] - 8:8
**fiber** [1] - 4:21
**Fifth** [4] - 3:22, 37:18, 42:11, 42:12
**fight** [5] - 10:4, 36:1, 36:2, 36:9, 41:22
**figure** [1] - 5:1
**file** [1] - 19:7
**filed** [15] - 12:15, 12:16, 14:24, 18:10, 18:12, 19:8, 22:23, 23:1, 27:17, 27:19,

29:9, 29:13, 29:16, 37:14, 45:14
**final** [6] - 12:2, 12:22, 41:5, 41:9, 43:6, 43:19
**fine** [5] - 13:9, 18:23, 20:4, 25:22, 41:12
**first** [12] - 5:17, 19:3, 22:20, 23:5, 37:8, 42:1, 43:23, 45:18, 47:25, 48:1, 52:5, 55:2
**five** [1] - 31:13
**flashlight** [1] - 60:7
**flouting** [1] - 49:15
**folk** [1] - 39:13
**folks'** [1] - 37:7
**follow** [2] - 29:22, 58:23
**followed** [1] - 29:23
**FOR** [2] - 1:14, 1:17
**foregoing** [1] - 61:3
**forest** [3] - 14:13, 26:17, 35:18
**fork** [2] - 40:10
**form** [1] - 58:23
**Fort** [1] - 14:1
**forth** [1] - 11:1
**forward** [1] - 53:19
**foster** [2] - 21:4, 21:6
**Foster's** [2] - 46:9, 46:11
**fought** [1] - 49:1
**four** [5] - 8:23, 24:16, 31:13, 55:1
**fraud** [1] - 10:25
**Frederick** [4] - 7:12, 8:5, 25:9, 39:22
**free** [1] - 28:5
**freeway** [1] - 7:25
**French** [3] - 25:17, 25:21, 32:5
**friend** [1] - 31:11
**front** [2] - 13:4, 58:6
**frustration** [1] - 26:13
**fun** [2] - 22:6, 59:2
**funny** [1] - 59:5
**Furgeson** [1] - 59:16
**future** [1] - 46:15

**G**

**Gabriel** [1] - 25:9
**gained** [1] - 11:12
**gavel** [1] - 58:12
**Gene** [1] - 13:10
**General** [7] - 14:6, 39:14, 56:6, 56:9, 56:11, 57:3, 57:12
**generates** [1] - 31:12
**generations** [4] - 23:16, 24:1, 24:3, 24:16
**girl** [1] - 44:9
**given** [2] - 5:5, 56:25
**GLO** [8] - 6:13, 10:20, 11:1, 34:5, 34:7, 34:20, 39:5, 39:12
**Goliad** [3] - 24:5, 25:7, 32:2
**Gonsoulin** [1] - 59:17
**Gonzalez** [1] - 50:16
**Goodson** [1] - 59:21

**government** [1] - 17:1
**governor** [1] - 52:5
**grades** [1] - 12:10
**grand** [4] - 49:17
**grand-grand-grand-grand-grandchildren** [1] - 49:17
**grandchildren** [1] - 49:17
**grandfather** [1] - 59:21
**grant** [4] - 50:16, 50:24, 52:22, 52:23
**granted** [3] - 35:12, 43:2, 43:7
**granting** [1] - 43:3
**graphic** [1] - 4:8
**Great** [2] - 6:24, 7:8
**great** [1] - 60:2
**green** [3] - 5:6, 5:9, 5:11
**Grogan** [2] - 37:9, 37:13
**Grogan-Cochran** [2] - 37:9, 37:13
**ground** [1] - 49:10
**growl** [1] - 58:15
**grown** [1] - 26:13
**GSA** [1] - 20:16
**guess** [4] - 11:22, 16:20, 44:15, 55:13
**Gulf** [1] - 46:7
**guy** [2] - 31:9, 49:1

**H**

**hair** [1] - 24:16
**half** [3] - 44:22, 44:23, 54:17
**hand** [2] - 6:16, 41:19
**handout** [1] - 42:15
**handwritten** [1] - 35:1
**happy** [2] - 14:13, 26:4
**Harbor** [2] - 29:10, 29:12
**hard** [2] - 29:20, 49:22
**head** [1] - 35:13
**headed** [1] - 4:18
**hear** [5] - 26:10, 33:21, 35:10, 37:11, 45:18
**HEARD** [1] - 1:10
**heard** [1] - 44:5
**hearing** [1] - 33:16
**heart** [1] - 58:9
**heavy** [1] - 5:12
**height** [1] - 39:3
**heir** [2] - 24:18, 25:3
**heirs** [17] - 8:13, 8:20, 12:17, 15:1, 23:4, 23:16, 23:22, 24:15, 25:13, 28:13, 32:1, 32:23, 33:9, 33:23, 36:4, 37:21, 49:12
**held** [2] - 45:23, 57:19
**help** [3] - 22:7, 51:20, 55:12
**hereby** [1] - 61:3
**heroes** [1] - 52:24
**Hidden** [1] - 1:15
**highlighted** [1] - 8:3
**history** [3] - 50:15, 50:23, 50:25
**Hodge** [3] - 10:16, 10:17, 10:18, 10:19, 10:21, 10:24, 11:9, 11:13, 11:14,

11:15, 30:20, 35:15, 37:24, 38:5, 38:7, 39:4, 39:11, 39:22, 39:23, 40:8, 42:20, 44:2, 51:7, 51:8, 51:22, 53:3, 53:19, 54:15, 54:19, 55:5, 57:4
**Hodges** [3] - 11:15, 35:19, 38:25
**Holliman** [1] - 58:8
**home** [1] - 60:6
**Honor** [42] - 3:5, 3:8, 3:11, 3:16, 3:19, 4:7, 4:20, 5:5, 5:11, 6:12, 8:25, 10:15, 10:19, 11:21, 12:4, 12:8, 13:12, 19:23, 20:4, 20:12, 20:19, 22:12, 24:9, 32:10, 37:1, 39:6, 39:18, 40:1, 40:21, 41:14, 42:21, 43:12, 44:2, 45:3, 45:22, 46:3, 46:20, 47:12, 47:15, 51:4, 59:5, 60:11
**HONORABLE** [1] - 1:10
**honorary** [1] - 21:11
**hopefully** [1] - 4:18
**horrible** [1] - 50:3
**horse** [1] - 31:9
**HORTON** [1] - 1:7
**Horton** [21] - 5:8, 5:14, 9:14, 10:1, 11:4, 13:20, 14:14, 14:24, 18:18, 19:9, 20:18, 22:15, 23:13, 27:2, 28:12, 36:12, 36:21, 47:21, 47:23, 48:6, 48:17
**Horton's** [6] - 26:21, 27:24, 48:1, 48:14, 48:23, 49:3
**HORTON-TEXAS** [1] - 1:7
**hot** [2] - 5:1, 5:2
**house** [1] - 4:25
**houses** [1] - 44:11
**Houston** [4] - 1:20, 1:23, 2:4, 4:23
**HOUSTON** [2] - 1:2, 1:5
**Hudspeth** [1] - 1:18
**HUGHES** [1] - 1:10
**humanly** [1] - 60:10
**humility** [1] - 44:5
**hundred** [2] - 9:8, 11:10
**hunky** [1] - 13:8
**hunky-dory** [1] - 13:8
**hunt** [1] - 52:2
**Hunton** [1] - 53:4
**hurting** [1] - 50:6

**I**

**identified** [1] - 34:1
**identify** [1] - 14:6
**III** [1] - 1:17
**imagine** [2] - 4:2, 29:20
**important** [3] - 16:5, 55:18, 55:21
**importantly** [2] - 18:1, 48:4
**improperly** [2] - 14:17, 34:1
**improve** [1] - 52:18
**includes** [1] - 30:19
**incorrect** [1] - 13:16
**increased** [2] - 10:23, 11:8
**indeed** [1] - 45:1
**independent** [2] - 16:5, 53:10
**index** [1] - 54:22
**indicate** [1] - 54:20

**inherited** [1] - 21:12
**initial** [1] - 43:10
**inquiry** [2] - 41:9, 43:7
**inside** [1] - 5:7
**instead** [1] - 54:19
**instruments** [1] - 35:24
**insurance** [2] - 16:2, 20:20
**intended** [1] - 45:1
**interest** [1] - 48:16
**interested** [2] - 9:21, 19:3
**interesting** [1] - 50:15
**interject** [1] - 32:10
**International** [2] - 6:24, 7:7
**Internet** [2] - 4:22, 4:24
**interpreting** [1] - 52:16
**interrupt** [5] - 12:7, 25:23, 31:3, 31:4, 31:5
**interrupting** [2] - 26:2, 57:21
**invoked** [1] - 48:22
**invoking** [1] - 48:5
**involve** [2] - 9:5, 57:12
**involved** [18] - 5:6, 5:12, 5:24, 9:3, 9:5, 9:10, 9:11, 9:25, 10:1, 10:10, 30:21, 32:14, 39:20, 40:4, 40:14, 56:7, 56:20
**involving** [1] - 57:12
**issue** [12] - 6:1, 6:17, 6:19, 7:2, 7:18, 7:20, 7:25, 8:1, 8:4, 8:11, 14:5, 45:3
**issues** [2] - 26:12, 52:25
**it'll** [1] - 57:16

## J

**Jacinto** [7] - 7:11, 39:16, 39:17, 39:19, 40:10, 40:11, 40:13
**JAMES** [1] - 1:4
**James** [8] - 11:15, 25:10, 25:12, 25:13, 39:4, 39:11, 39:23, 42:20
**Jess** [1] - 58:8
**John** [1] - 10:6
**Johnson** [1] - 60:3
**join** [2] - 43:15, 51:9
**joinder** [3] - 17:16, 51:20, 54:10
**joined** [15] - 8:10, 13:23, 14:17, 17:2, 17:4, 23:12, 28:13, 28:14, 36:19, 36:20, 51:16, 51:18, 52:21, 53:6, 53:14
**Joseph** [1] - 40:2
**jotting** [1] - 26:7
**JR** [1] - 1:17
**Judge** [12] - 4:17, 13:3, 14:2, 19:24, 37:3, 37:16, 47:17, 55:6, 57:8, 57:22, 58:6, 58:16
**judge** [10] - 12:23, 13:1, 13:2, 27:6, 27:20, 50:11, 54:23, 58:8, 59:4
**JUDGE** [1] - 1:10
**judges** [4] - 13:5, 58:22, 59:11, 59:12
**judgment** [54] - 3:10, 3:17, 3:23, 4:9, 4:11, 5:7, 9:1, 10:23, 11:8, 12:2, 12:22, 12:25, 14:20, 17:5, 17:15, 17:22, 17:24, 18:13, 18:16, 18:22, 18:25, 23:11, 24:23, 26:22, 27:2, 27:21, 27:24, 28:12,

29:1, 37:17, 38:13, 38:16, 38:18, 38:20, 38:22, 39:10, 39:20, 41:5, 41:9, 42:25, 43:2, 43:5, 43:6, 43:8, 43:20, 49:4, 51:12, 53:10, 53:11, 54:9, 57:15
**judgments** [1] - 53:11
**judicata** [5] - 15:13, 16:7, 43:10, 49:7
**judicial** [1] - 8:8
**judicially** [1] - 8:19
**jumped** [1] - 58:12
**jurisdiction** [2] - 18:17, 19:20
**jury** [2] - 26:14, 58:10
**jus** [4] - 28:18, 49:16, 52:7, 52:9

## K

**Kansas** [1] - 18:4
**Kathie** [1] - 44:13
**keep** [3] - 32:3, 32:20, 42:7
**Kennerly** [5] - 13:1, 13:2, 13:3, 37:16, 55:6
**Kennerly's** [1] - 14:2
**kept** [1] - 56:18
**killed** [3] - 24:4, 25:8, 32:2
**kind** [4] - 8:18, 22:6, 50:15, 54:3
**kitchen** [1] - 5:3
**knows** [1] - 47:18

## L

**label** [2] - 38:3, 38:7
**Land** [13] - 7:5, 14:6, 30:10, 38:24, 39:14, 54:14, 56:6, 56:9, 56:11, 56:19, 56:25, 57:3, 57:12
**land** [51] - 7:6, 7:9, 7:23, 10:2, 12:2, 13:20, 13:22, 14:14, 16:17, 16:21, 19:3, 21:12, 21:19, 24:5, 25:10, 27:7, 28:21, 29:21, 30:19, 30:22, 32:18, 32:20, 32:22, 32:24, 33:1, 33:17, 35:16, 35:17, 35:20, 35:23, 36:22, 42:10, 47:5, 48:17, 48:23, 48:25, 49:3, 53:1, 53:20, 54:11, 56:4, 56:8, 56:13, 56:15, 56:24, 57:12, 57:15
**landman** [2] - 24:10, 35:24
**landowner** [1] - 21:11
**lands** [2] - 35:13, 56:18
**Lane** [1] - 1:22
**Lanie** [3] - 2:1, 61:2, 61:6
**Larry** [1] - 60:3
**last** [1] - 17:9
**Latin** [4] - 28:18, 52:8, 52:11, 52:13
**latrine** [1] - 60:7
**LAW** [1] - 20:8
**law** [12] - 1:14, 12:9, 14:7, 17:23, 26:24, 26:25, 27:22, 28:17, 41:1, 41:2, 55:14
**lawsuit** [10] - 4:10, 5:13, 5:25, 7:1, 8:25, 20:25, 40:4, 46:19, 48:2, 51:10
**lawyer** [4] - 21:4, 28:8, 57:19, 59:20
**lawyers** [1] - 59:8
**laying** [1] - 22:17

**league** [11] - 8:21, 10:20, 10:21, 10:22, 10:24, 24:6, 44:3, 51:7, 51:8, 53:21, 57:4
**learn** [2] - 50:6, 50:9
**learned** [2] - 13:21, 13:23
**least** [4] - 22:22, 25:24, 34:4, 38:21
**leave** [1] - 50:12
**Lee** [1] - 13:5
**left** [1] - 21:14
**legal** [1] - 26:12
**length** [2] - 39:3, 42:5
**less** [1] - 55:7
**Lester** [1] - 59:21
**level** [1] - 46:5
**levels** [1] - 55:1
**library** [2] - 21:18, 21:20
**life** [2] - 24:18, 44:11
**light** [2] - 50:25, 58:14
**line** [8] - 5:17, 10:9, 10:13, 11:18, 42:1, 42:4, 47:4, 47:6
**lines** [6] - 34:17, 42:5, 42:16, 44:21, 54:19, 54:20
**link** [1] - 50:20
**listened** [1] - 48:10
**litany** [1] - 18:15
**litigate** [2] - 18:5, 55:11
**litigated** [2] - 48:12, 49:8
**litigation** [1] - 20:23
**live** [2] - 5:3, 22:4
**lived** [4] - 35:15, 35:17, 47:18, 47:24
**living** [3] - 14:10, 37:3, 40:19
**lizards** [1] - 5:3
**long-time** [1] - 21:4
**look** [8] - 6:15, 14:15, 17:3, 17:4, 34:23, 34:24, 47:8, 51:2
**looked** [4] - 14:16, 22:6, 29:8, 55:6
**looking** [2] - 41:15, 58:10
**looks** [3] - 6:8, 6:16, 40:5
**Loop** [1] - 1:19
**lose** [1] - 52:16
**losing** [1] - 26:17
**lost** [10] - 9:15, 9:16, 10:12, 12:1, 12:13, 41:10, 48:21, 48:22, 52:15, 58:17
**Louis** [1] - 52:2
**low** [1] - 39:3
**lower** [4] - 6:16, 7:15, 26:9, 41:19
**LTD** [1] - 1:7
**Lumber** [2] - 37:10, 37:13
**lunch** [2] - 20:14, 26:7
**Lynn** [2] - 59:4, 59:16
**LYNN** [1] - 1:10

## M

**ma'am** [12] - 12:7, 13:14, 13:17, 15:6, 15:15, 34:3, 54:21, 55:6, 56:12, 56:18, 57:19
**machine** [1] - 57:10

**Madeley** [3] - 21:3, 21:4, 21:6
**Magnolia** [3] - 21:15, 21:18, 22:8
**main** [2] - 40:9, 40:10
**man** [2] - 25:11, 53:12
**map** [15] - 6:13, 7:5, 24:25, 30:10, 31:12, 34:16, 34:18, 35:22, 38:25, 39:5, 39:12, 40:6, 40:11, 40:13, 54:14
**map..** [1] - 41:15
**mark** [1] - 31:15
**marked** [4] - 34:1, 39:21, 54:16, 54:19
**marks** [4] - 14:8, 30:13, 32:17, 34:2
**mask** [2] - 7:16, 26:10
**matter** [5] - 4:4, 15:6, 38:16, 45:24, 61:4
**matters** [1] - 46:6
**MCAD** [1] - 14:11
**McComb** [2] - 37:19, 42:9
**McConnell** [9] - 1:17, 1:19, 7:19, 13:16, 14:22, 20:11, 36:25, 47:12, 49:7
**MCCONNELL** [82] - 3:5, 3:8, 3:11, 3:16, 3:19, 3:21, 4:5, 4:7, 4:20, 5:5, 5:10, 5:19, 5:23, 6:3, 6:5, 6:9, 6:18, 6:21, 8:25, 9:24, 10:8, 10:15, 10:17, 11:21, 12:8, 12:11, 12:15, 12:20, 12:24, 13:3, 13:10, 19:23, 20:4, 20:12, 20:15, 20:19, 20:24, 21:3, 21:6, 21:8, 22:11, 22:14, 23:8, 23:15, 24:2, 37:1, 37:3, 37:7, 37:12, 37:21, 37:25, 38:5, 39:5, 39:9, 39:25, 40:3, 40:12, 40:18, 41:2, 41:17, 41:21, 41:24, 42:3, 42:11, 42:14, 42:18, 42:21, 43:16, 43:23, 44:1, 45:22, 46:3, 46:11, 46:16, 47:9, 58:6, 59:5, 59:12, 59:17, 60:1, 60:3, 60:11
**McCormack** [5] - 37:9, 37:12, 37:19, 42:9, 42:12
**MD** [1] - 1:4
**mean** [7] - 28:3, 29:19, 35:9, 35:11, 47:17, 50:17, 51:14
**means** [4] - 12:1, 18:2, 18:4, 28:18
**mechanical** [2] - 1:24, 4:3
**meeting** [1] - 3:14
**men** [1] - 31:16
**mention** [1] - 51:23
**mercifully** [1] - 59:19
**mess** [2] - 8:23, 13:11
**messed** [1] - 13:9
**met** [1] - 59:22
**Metcalf** [1] - 21:8
**metes** [17] - 4:3, 4:8, 30:11, 30:16, 30:18, 30:25, 31:1, 31:7, 31:12, 38:1, 38:2, 38:6, 39:15, 47:20, 47:21, 48:13, 57:15
**Metzger** [4] - 23:18, 23:19, 24:15, 24:17
**Mexico** [1] - 46:8
**microfilmed** [1] - 50:25
**microphone** [2] - 13:17, 26:11
**middle** [3] - 11:18, 21:16, 39:7
**might** [3] - 31:17, 41:14, 55:14
**miles** [1] - 31:13

**Miller** [4] - 39:23, 40:5, 40:8, 40:15
**mind** [1] - 41:8
**minor** [1] - 7:5
**minute** [5] - 28:15, 29:24, 30:14, 32:23, 36:3
**minutes** [2] - 3:14, 26:5
**misapplication** [1] - 17:23
**Mississippi** [1] - 16:17
**moccasins** [1] - 59:25
**modest** [1] - 55:13
**Monday** [1] - 29:12
**Montgomery** [6] - 7:6, 21:12, 21:17, 48:4, 48:9, 55:8
**morning** [2] - 4:18, 20:6
**morphed** [1] - 23:6
**Mortgage** [1] - 18:14
**most** [1] - 18:5
**mostly** [1] - 49:23
**motel** [1] - 4:25
**mother** [1] - 24:17
**MOTION** [1] - 1:9
**motion** [7] - 4:10, 18:1, 18:10, 24:23, 38:22, 42:25, 49:20
**mouth** [2] - 34:4, 50:12
**moved** [1] - 52:2
**MR** [100] - 1:17, 1:17, 1:18, 1:21, 3:5, 3:8, 3:11, 3:16, 3:19, 3:21, 4:5, 4:7, 4:17, 4:20, 4:21, 5:5, 5:10, 5:19, 5:23, 6:3, 6:5, 6:9, 6:18, 6:21, 8:25, 9:24, 10:8, 10:15, 10:17, 11:21, 12:8, 12:11, 12:15, 12:20, 12:24, 13:3, 13:10, 19:23, 19:24, 20:4, 20:12, 20:15, 20:19, 20:24, 21:3, 21:6, 21:8, 22:11, 22:14, 23:8, 23:15, 24:2, 37:1, 37:3, 37:7, 37:12, 37:21, 37:25, 38:5, 39:5, 39:9, 39:25, 40:3, 40:12, 40:18, 41:2, 41:17, 41:21, 41:24, 42:3, 42:11, 42:14, 42:18, 42:21, 43:16, 43:23, 44:1, 45:22, 46:3, 46:11, 46:16, 47:9, 47:12, 47:15, 47:17, 49:13, 49:19, 50:1, 50:9, 57:8, 57:22, 58:6, 59:5, 59:12, 59:16, 59:17, 60:1, 60:2, 60:3, 60:11
**MS** [108] - 1:14, 6:12, 6:25, 7:13, 7:17, 8:8, 8:13, 8:16, 8:24, 10:19, 11:16, 11:20, 12:4, 13:12, 13:15, 13:19, 15:4, 15:9, 15:11, 15:16, 15:19, 15:22, 15:24, 16:3, 16:10, 16:14, 16:16, 17:20, 18:3, 18:7, 18:9, 18:21, 18:25, 19:4, 19:8, 19:15, 19:18, 24:9, 24:18, 24:22, 25:8, 25:15, 25:19, 27:13, 30:3, 30:7, 31:23, 32:9, 32:16, 33:9, 33:11, 33:20, 33:22, 34:5, 34:8, 34:10, 34:15, 34:19, 34:22, 35:14, 35:18, 35:23, 36:4, 36:7, 36:12, 36:16, 36:19, 36:21, 39:17, 40:7, 41:14, 43:12, 44:2, 45:14, 50:17, 50:19, 50:22, 50:24, 51:4, 51:7, 51:15, 51:22, 52:4, 52:7, 52:10, 52:14, 52:20, 53:3, 53:17, 53:25, 54:3, 54:8, 54:17, 54:23, 55:3, 55:5, 55:14, 55:17, 55:20, 55:23, 55:25, 56:4, 56:14, 56:19, 56:23, 57:18, 57:25,

58:3
**must** [6] - 13:8, 17:6, 17:14, 17:24, 18:10, 18:11

**N**

**name** [4] - 21:5, 52:7, 55:2, 59:20
**named** [2] - 24:15, 25:12
**names** [2] - 37:7, 59:14
**narrow** [3] - 8:18, 39:3, 46:2
**national** [1] - 56:17
**need** [7] - 18:19, 24:22, 25:1, 34:11, 43:13, 53:15, 59:2
**negotiated** [3] - 24:19, 33:20, 33:22
**Nelson** [2] - 26:11, 26:12
**nephew** [1] - 21:8
**never** [29] - 10:21, 14:4, 14:5, 15:14, 17:1, 18:17, 18:25, 19:5, 19:18, 22:6, 24:15, 26:14, 28:13, 30:12, 31:18, 36:1, 36:6, 36:17, 36:20, 36:22, 48:12, 52:20, 53:20, 57:2, 57:19, 57:20, 58:16, 58:17, 59:22
**new** [1] - 21:18
**next** [3] - 14:10, 14:13, 21:1
**nice** [2] - 31:16, 55:10
**nicer** [1] - 44:8
**niche** [1] - 40:16
**Ninth** [1] - 58:9
**no-conflict** [1] - 34:10
**no-warranty** [2] - 53:24, 54:1
**nobody** [6] - 15:17, 26:10, 33:2, 33:8, 33:17, 35:17
**none** [3] - 30:21, 34:13, 35:21
**noon** [2] - 3:14, 58:11
**normal** [1] - 58:25
**North** [1] - 1:15
**north** [8] - 6:7, 7:8, 10:9, 10:13, 10:15, 11:17, 38:25
**northern** [1] - 38:18
**Northern** [2] - 6:24, 7:8
**nos** [1] - 33:13
**note** [1] - 55:13
**notes** [3] - 26:8, 35:1, 35:3
**nothing** [4] - 10:24, 12:21, 26:25, 49:22
**notice** [1] - 38:21
**notified** [1] - 36:22
**nullity** [5] - 16:5, 16:10, 17:5, 17:6, 17:13
**Number** [2] - 42:23, 43:1
**number** [2] - 42:24, 59:23
**numbered** [1] - 61:4
**nut** [1] - 50:23

**O**

**Oak** [1] - 1:22
**Oaks** [1] - 1:15
**object** [2] - 50:4, 50:6
**obtained** [2] - 23:4, 33:22

**obvious** [1] - 21:14
**obviously** [1] - 27:5
**occasionally** [1] - 59:2
**odd** [1] - 9:8
**odds** [1] - 56:17
**OF** [2] - 1:1, 1:9
**offer** [1] - 55:14
**office** [1] - 4:22
**Office** [14] - 1:14, 7:5, 14:6, 30:10, 38:25, 39:14, 54:14, 56:6, 56:9, 56:11, 56:19, 56:25, 57:3, 57:13
**Official** [4] - 2:1, 2:1, 61:2, 61:6
**often** [1] - 38:10
**oil** [1] - 55:10
**old** [4] - 13:2, 32:4, 56:3, 58:4
**once** [5] - 8:6, 15:25, 44:24, 59:3, 59:22
**one** [53] - 3:18, 4:14, 5:9, 6:15, 8:21, 10:20, 10:21, 10:24, 11:13, 12:18, 12:20, 17:7, 17:10, 19:25, 23:17, 23:18, 23:20, 26:18, 32:10, 34:6, 34:8, 34:11, 35:15, 37:9, 40:17, 40:18, 42:17, 42:18, 42:25, 43:23, 44:2, 44:13, 44:15, 50:13, 50:18, 51:2, 51:4, 51:7, 52:4, 53:21, 54:7, 55:2, 55:14, 55:17, 56:10, 56:19, 57:4, 57:20, 58:9, 59:4, 59:14
**one-acre** [1] - 11:13
**one-third-league** [1] - 8:21
**ones** [1] - 4:4
**open** [2] - 29:12, 29:17
**opinion** [14] - 3:10, 3:22, 13:4, 17:19, 17:20, 17:21, 19:9, 42:11, 43:14, 53:5, 55:13, 55:15, 55:18, 55:21
**opportunity** [7] - 17:2, 17:3, 17:8, 17:11, 18:23, 19:2, 52:21
**oppose** [1] - 26:25
**optic** [1] - 4:21
**oranges** [1] - 57:11
**ordinarily** [1] - 25:22
**original** [11] - 5:22, 5:23, 5:24, 13:22, 18:12, 32:6, 32:7, 53:12, 53:13, 53:15
**originally** [2] - 15:7, 37:14
**ought** [4] - 9:22, 41:8, 41:11
**outcroppings** [1] - 31:15
**outline** [2] - 5:11, 5:12
**outlined** [2] - 41:18, 42:15
**outlines** [1] - 11:13
**overlap** [2] - 8:15, 34:18
**own** [18] - 8:10, 8:12, 8:14, 16:21, 17:17, 24:9, 30:22, 34:3, 40:25, 41:4, 46:25, 48:14, 48:16, 48:25, 49:3, 54:11, 54:12, 57:15
**owned** [7] - 14:12, 21:9, 25:12, 33:4, 47:25, 48:11, 57:16
**owner** [8] - 53:12, 53:13, 53:15, 53:16, 53:17, 53:19
**owners** [15] - 10:25, 35:15, 35:25, 36:4, 51:9, 51:16, 51:17, 51:18, 51:22, 53:3, 53:18, 53:19, 57:5
**ownership** [5] - 13:24, 14:16, 26:21,

37:22
**owns** [1] - 48:17

---

## P

**pad** [1] - 31:9
**paid** [2] - 33:8, 33:17
**paper** [3] - 44:4, 50:16, 50:25
**paperwork** [1] - 52:24
**parallel** [1] - 42:16
**pardon** [6] - 28:17, 31:25, 46:22, 55:16, 55:24, 57:25
**part** [14] - 4:10, 6:18, 8:9, 8:16, 8:19, 23:13, 25:11, 36:7, 38:22, 39:2, 47:2, 47:3, 47:25, 56:15
**particular** [1] - 8:9
**parties** [5] - 13:22, 13:24, 49:13, 54:10, 57:2
**partition** [1] - 38:10
**partitioned** [1] - 38:9
**partitioning** [1] - 37:22
**party** [4] - 16:5, 51:22, 53:6, 56:7
**past** [1] - 26:12
**patent** [13] - 7:2, 16:18, 16:20, 16:23, 17:9, 56:5, 56:22, 56:23, 56:24, 56:25, 57:1, 57:14, 57:18
**patented** [3] - 7:22, 10:20, 34:25
**patents** [3] - 32:6, 34:22, 56:21
**PAUL** [1] - 1:17
**Paul** [1] - 47:18
**pay** [3] - 21:13, 33:4, 35:21
**paying** [1] - 36:1, 56:17
**Pearl** [2] - 29:10, 29:12
**pencil** [1] - 31:9
**pendency** [2] - 45:24, 46:18
**people** [15] - 13:8, 15:8, 16:1, 16:19, 23:15, 23:21, 25:4, 32:25, 36:17, 38:8, 45:20, 55:4, 55:10, 57:21, 58:20
**percent** [1] - 44:21
**perfect** [1] - 25:19
**period** [2] - 16:22, 44:11
**person** [2] - 44:24, 44:25
**personally** [1] - 24:19
**Pete** [1] - 58:20
**petition** [2] - 9:17, 9:19
**phrase** [1] - 11:22
**picks** [1] - 39:15
**piece** [2] - 21:19, 55:17
**pine** [1] - 55:9
**pipeline** [1] - 38:15
**Piper** [1] - 47:14
**PIPER** [2] - 1:18, 47:15
**Pittman** [1] - 13:10
**place** [1] - 4:25
**placed** [2] - 23:23, 46:13
**plains** [1] - 31:14
**PLAINTIFF** [1] - 1:14
**plaintiff** [1] - 15:21
**plat** [8] - 7:20, 10:20, 38:18, 38:21,

41:16, 44:20, 45:4, 46:18
**plats** [6] - 14:11, 44:24, 45:4, 45:13, 54:12
**platted** [2] - 44:16, 45:8
**play** [1] - 23:18
**plea** [2] - 19:10
**plead** [1] - 24:4
**pleaded** [1] - 19:14
**pleadings** [2] - 15:18, 23:24
**point** [8] - 7:7, 12:3, 14:4, 28:1, 31:7, 36:10, 40:21, 49:25
**Point** [1] - 3:14
**policy** [4] - 20:20, 24:21, 24:22, 25:1
**poor** [1] - 49:16
**portion** [16] - 5:25, 6:6, 6:22, 7:18, 9:2, 9:4, 9:13, 11:3, 23:2, 33:25, 39:10, 39:11, 40:13, 46:25, 47:1
**position** [2] - 42:19, 42:21
**possess** [1] - 48:2
**possessed** [2] - 7:14, 7:23
**possession** [9] - 23:6, 27:9, 27:11, 35:7, 35:8, 35:12, 35:15, 35:20, 48:15
**possible** [1] - 60:10
**Post** [1] - 1:22
**potential** [1] - 43:15
**power** [2] - 48:5, 48:22
**powerful** [1] - 59:20
**practice** [1] - 58:6
**practiced** [1] - 58:4
**predecessor** [1] - 53:8
**predecessors** [3] - 20:22, 20:24, 37:8
**premise** [1] - 35:4
**prepare** [1] - 35:24
**prepared** [1] - 14:19
**present** [2] - 43:18, 47:22
**presented** [1] - 43:19
**prettier** [1] - 44:8
**pretty** [1] - 40:19
**prevented** [1] - 16:6
**princessdom** [1] - 44:10
**printed** [1] - 58:23
**problem** [5] - 5:4, 26:3, 32:11, 32:17, 45:9, 49:11, 51:25
**procedural** [1] - 17:23
**Proceedings** [1] - 1:24
**PROCEEDINGS** [1] - 1:9
**proceedings** [3] - 6:2, 60:12, 61:4
**process** [1] - 43:8
**produced** [1] - 1:25
**producing** [1] - 4:2
**productive** [1] - 44:10
**prominent** [1] - 59:13
**pronounce** [1] - 52:12
**proper** [1] - 53:21
**property** [36] - 4:9, 9:5, 9:14, 22:15, 22:16, 22:22, 22:24, 23:13, 25:12, 28:12, 31:8, 32:19, 37:22, 37:23, 37:24, 37:25, 38:9, 38:12, 38:14, 38:17, 38:19, 39:2, 39:19, 40:4, 41:21, 42:5, 44:21,

45:8, 46:17, 46:25, 47:21, 47:25, 48:1, 48:14, 49:9

**provide** [2] - 26:24, 50:20
**provided** [5] - 7:19, 26:20, 26:24, 30:1, 30:12
**public** [3] - 53:1, 56:15, 56:18
**pull** [1] - 34:20
**purchased** [4] - 11:4, 13:20, 22:15
**purported** [1] - 23:22
**purportedly** [1] - 23:4
**put** [1] - 38:3
**putatively** [1] - 22:13
**Pyle** [1] - 8:7
**PYLE** [1] - 8:7

## Q

**questionable** [2] - 35:22, 54:16
**questions** [1] - 43:14
**quiet** [11] - 13:20, 14:15, 14:24, 19:5, 24:23, 27:3, 32:20, 32:21, 43:13, 49:23
**quieting** [1] - 48:6
**quitclaim** [2] - 23:21, 54:4
**quitclaims** [4] - 36:11, 36:14, 36:15, 49:2
**quote** [2] - 16:4, 16:13
**quoted** [1] - 17:22

## R

**railroad** [1] - 7:25
**Railway** [2] - 6:24, 7:8
**ran** [1] - 31:11
**ranch** [1] - 21:13
**re** [1] - 55:11
**re-litigate** [1] - 55:11
**read** [4] - 14:2, 16:12, 30:5, 39:13
**reading** [1] - 16:15
**real** [2] - 21:22, 50:6
**really** [6] - 9:9, 31:3, 44:8, 47:19, 49:9, 52:3
**reason** [3] - 4:25, 20:7, 43:2
**reasons** [2] - 21:14, 42:22
**recent** [1] - 6:2
**recess** [1] - 20:9
**recognize** [2] - 24:11, 54:12
**reconvene** [1] - 20:3
**record** [4] - 3:6, 23:23, 35:25, 61:4
**recorded** [2] - 1:24, 49:5
**records** [5] - 53:1, 53:2, 56:7, 56:11, 58:24
**recover** [3] - 40:24, 41:3
**rectangle** [1] - 39:3
**red** [7] - 5:7, 5:13, 6:16, 42:4, 42:15, 42:16
**redo** [1] - 29:20
**reference** [1] - 38:16
**referenced** [1] - 38:18
**refresher** [1] - 59:1
**refreshing** [1] - 59:2

**regardless** [2] - 43:5, 43:17
**relation** [1] - 25:14
**relatives** [1] - 52:2
**reliable** [1] - 36:11
**reliant** [1] - 44:10
**reluctantly** [1] - 3:15
**remember** [5] - 17:18, 21:1, 23:18, 53:7, 59:19
**reminded** [1] - 58:8
**remove** [1] - 48:5
**removed** [2] - 23:16, 37:14
**rendered** [1] - 17:24
**reopen** [1] - 50:14
**rep** [1] - 21:9
**REPORTER** [1] - 34:11
**Reporter** [4] - 2:1, 2:1, 61:2, 61:6
**REPORTER'S** [1] - 61:1
**republic** [1] - 28:5
**Republican** [1] - 59:8
**requires** [1] - 19:20
**res** [5] - 15:13, 16:7, 43:10, 49:7
**research** [2] - 13:25, 24:8
**resolved** [1] - 40:22
**respect** [1] - 41:17
**rest** [4] - 9:10, 10:3, 20:1, 42:7
**retreading** [2] - 49:10, 49:21
**retried** [1] - 15:23
**retry** [1] - 46:6
**return** [1] - 44:7
**retyped** [1] - 4:6
**revenue** [1] - 22:8
**review** [1] - 9:17
**revolution** [2] - 24:6, 49:1
**Richmond** [1] - 44:15
**ride** [1] - 4:16
**Ridge** [2] - 46:9, 46:11
**right-hand** [2] - 6:16, 41:19
**right-of-way** [1] - 46:15
**right-of-ways** [1] - 46:16
**rights** [1] - 49:9
**rigid** [1] - 16:6
**rise** [1] - 20:8
**risk** [1] - 26:3
**River** [6] - 7:11, 39:16, 39:17, 39:19, 40:11, 40:13
**river** [5] - 5:18, 5:20, 8:19, 40:14, 40:16
**RMR** [2] - 2:1, 61:2
**road** [4] - 44:19, 46:15, 46:16
**rocky** [1] - 31:14
**Roger** [2] - 23:18, 23:19
**room** [1] - 13:18
**Room** [1] - 2:3
**ruin** [1] - 20:13
**rule** [4] - 15:20, 17:10, 28:9, 28:17
**Rule** [8] - 18:1, 18:9, 18:10, 19:20, 27:19, 28:7, 40:25, 51:13
**ruled** [6] - 15:13, 19:16, 41:4, 46:5, 50:11, 59:9

**rules** [4] - 29:22, 29:23, 58:22, 59:1
**ruling** [3] - 8:9, 27:1, 43:10
**rulings** [1] - 7:21
**run** [4] - 4:14, 35:23, 40:12, 42:5
**running** [2] - 38:25, 45:25
**runs** [2] - 7:10, 39:18
**Rusk** [1] - 2:3
**Ryan** [1] - 1:22

## S

**sale** [1] - 45:23
**Salino** [1] - 58:20
**San** [7] - 7:11, 39:16, 39:17, 39:19, 40:10, 40:11, 40:13
**Santa** [1] - 56:16
**satisfied** [1] - 45:1
**saw** [3] - 20:6, 52:3, 52:5
**school** [2] - 7:6, 12:9
**Scout** [1] - 59:25
**Scouts** [1] - 59:24
**seals** [1] - 20:17
**seated** [2] - 3:2, 20:10
**second** [1] - 22:20
**Section** [2] - 46:9, 46:11
**section** [1] - 7:14
**see** [8] - 13:4, 14:10, 14:11, 17:12, 32:18, 45:5, 46:21, 46:23
**self** [2] - 14:19, 44:10
**self-prepared** [1] - 14:19
**self-reliant** [1] - 44:10
**sell** [4] - 21:13, 45:2, 46:12, 53:20
**sensible** [1] - 58:21
**sent** [1] - 22:16
**separates** [1] - 6:14
**seq** [1] - 40:25
**served** [1] - 36:6
**set** [1] - 47:20
**settlement** [6] - 16:18, 16:20, 16:22, 16:23, 17:2, 17:9
**several** [2] - 11:15, 33:10
**sextant** [1] - 31:9
**SHARRETTS** [1] - 1:14
**Sharretts** [1] - 1:14
**sheet** [1] - 35:23
**shenanigans** [1] - 22:3
**shh** [1] - 32:20
**shifted** [1] - 44:20
**shoes** [1] - 53:13
**short** [1] - 57:22
**shot** [1] - 57:20
**show** [9] - 8:5, 11:1, 18:15, 25:2, 28:11, 28:20, 30:17, 30:18, 35:25
**showed** [2] - 13:7, 13:9, 53:6
**showing** [1] - 35:1
**shown** [5] - 7:5, 8:14, 35:21, 39:12, 57:4
**shows** [7] - 6:13, 10:20, 30:19, 34:16, 34:17, 45:4, 54:14

**shut** [2] - 49:25, 50:7
**Sibley** [1] - 13:4
**side** [1] - 39:19
**sides** [1] - 7:7
**Sieberman** [77] - 7:2, 7:12, 7:18, 7:20, 8:2, 8:3, 8:6, 8:9, 8:13, 8:14, 8:20, 8:22, 9:2, 9:4, 9:5, 9:6, 9:7, 9:8, 9:10, 9:14, 10:7, 10:25, 11:5, 11:9, 11:19, 12:17, 13:22, 14:4, 14:9, 14:20, 15:1, 23:3, 23:4, 23:16, 23:22, 24:3, 24:4, 24:6, 24:7, 24:25, 25:7, 25:9, 26:21, 28:12, 30:19, 30:21, 31:18, 32:1, 32:23, 33:19, 33:24, 36:4, 39:2, 39:11, 39:22, 40:12, 45:8, 45:11, 45:16, 48:3, 48:7, 48:12, 48:15, 49:12, 49:17, 50:17, 51:8, 51:9, 51:18, 51:24, 53:18, 53:20, 54:11, 57:3, 57:4
**Siebermans** [9] - 14:17, 23:25, 31:24, 32:13, 35:6, 35:14, 35:20, 51:11, 52:20
**silencio** [1] - 19:17
**simpler** [1] - 55:7
**sister** [1] - 44:7
**sit** [1] - 36:24
**sixth** [1] - 21:15
**Sixties** [1] - 21:10
**skip** [1] - 23:7
**slice** [1] - 54:18
**Smith** [3] - 2:1, 61:2, 61:6
**snake** [1] - 60:8
**sold** [5] - 21:14, 44:17, 44:25, 45:21, 45:22
**sole** [1] - 27:24
**solely** [1] - 26:22
**solid** [1] - 54:19
**some-odd** [1] - 9:8
**someone** [1] - 52:15
**somewhere** [4] - 12:25, 21:17, 38:6, 52:23
**son** [2] - 50:1, 59:13
**soon** [1] - 60:9
**sorry** [15] - 7:15, 15:16, 17:20, 20:5, 26:1, 26:16, 27:14, 27:17, 28:3, 28:6, 30:9, 31:21, 37:12, 46:24, 52:23
**sort** [1] - 58:21
**source** [1] - 22:8
**South** [3] - 1:19, 1:22, 52:13
**south** [4] - 7:8, 8:18, 10:6, 38:17
**southeast** [1] - 41:19
**southerly** [2] - 6:6, 39:10
**Southern** [1] - 61:2
**southern** [3] - 2:2, 6:10, 6:22
**SOUTHERN** [1] - 1:1
**southwest** [1] - 5:16
**sovereign** [7] - 24:14, 27:8, 27:25, 28:2, 28:3, 28:4, 40:2
**Sovereign** [1] - 40:15
**spans** [1] - 6:25
**speaks** [1] - 15:17
**special** [3] - 53:22, 53:23, 54:2

**specifically** [2] - 18:10, 19:9
**Spring** [1] - 39:1
**St** [1] - 52:2
**standing** [2] - 52:19
**stare** [1] - 42:24
**start** [4] - 22:16, 35:4, 43:21, 58:14
**started** [1] - 47:23
**starting** [2] - 10:8, 25:5
**starts** [2] - 5:15, 39:22
**state** [39] - 3:20, 4:11, 6:1, 7:19, 8:1, 8:2, 8:11, 9:3, 9:11, 9:12, 10:10, 11:2, 11:4, 11:25, 12:5, 12:12, 18:5, 18:11, 18:17, 19:1, 19:19, 21:8, 26:17, 26:20, 26:23, 26:25, 27:6, 27:20, 27:23, 37:14, 40:23, 43:19, 54:8, 54:25, 56:8, 56:23, 56:24, 56:25
**State** [2] - 24:5, 34:17
**STATES** [2] - 1:1, 1:10
**States** [5] - 2:2, 9:18, 16:17, 18:14, 48:19, 55:23, 55:25, 61:2
**stating** [1] - 43:2
**stay** [2] - 4:25, 58:21
**stayed** [1] - 47:22
**stenography** [1] - 1:24
**step** [3] - 53:13, 58:23, 59:21
**step-grandfather** [1] - 59:21
**stick** [1] - 50:12
**still** [5] - 43:6, 45:20, 53:16, 53:17, 60:5
**stole** [1] - 15:8
**stomping** [1] - 32:25
**stop** [4] - 29:5, 29:20, 32:22, 57:21
**stories** [3] - 24:19, 33:14, 50:3
**story** [2] - 21:16, 22:22
**Strake** [1] - 59:24
**street** [1] - 21:15
**strength** [2] - 40:24, 41:3
**stringing** [1] - 22:21
**strip** [8] - 7:10, 7:19, 8:6, 9:21, 9:23, 11:9, 33:19, 45:25
**stuck** [1] - 15:25
**study** [1] - 45:19
**stuff** [7] - 4:14, 26:19, 32:11, 44:14, 55:7, 55:8, 56:3
**style** [1] - 37:19
**sub** [1] - 19:17
**subdivision** [4] - 22:17, 22:18, 45:13, 60:1
**subject** [1] - 48:6
**suburbs** [1] - 20:1
**sued** [7] - 11:23, 11:24, 14:15, 37:6, 38:8, 53:8, 59:3
**suggest** [1] - 43:14
**suit** [22] - 10:10, 11:2, 11:4, 11:12, 11:24, 11:25, 12:12, 12:13, 12:14, 12:16, 13:20, 13:21, 17:22, 17:25, 22:23, 27:4, 33:25, 37:13, 40:23, 51:23, 53:7, 53:11
**Suite** [2] - 1:20, 1:23

**summary** [6] - 4:10, 23:10, 24:23, 38:22, 42:25, 43:2
**superimposed** [1] - 4:9
**suppose** [1] - 4:6
**supposed** [2] - 14:7, 29:24
**Supreme** [12] - 9:16, 9:17, 9:18, 9:19, 38:2, 48:19, 55:18, 55:20, 55:22, 55:25, 56:5, 56:20
**survey** [46] - 5:17, 7:4, 7:12, 7:18, 7:20, 7:22, 8:5, 11:5, 14:5, 14:9, 14:20, 23:3, 24:7, 29:7, 29:21, 29:25, 30:1, 30:8, 30:12, 30:24, 31:1, 31:7, 31:13, 32:16, 34:1, 34:4, 34:5, 34:7, 34:10, 34:14, 34:25, 35:2, 35:22, 37:24, 39:11, 40:9, 42:20, 44:2, 44:12, 48:4, 48:7, 48:12, 48:15, 51:7, 51:8, 54:19
**Survey** [8] - 10:16, 10:17, 10:18, 10:19, 10:21, 10:24, 11:13, 11:18
**surveying** [1] - 22:16
**surveyor** [3] - 31:11, 38:10, 38:11
**surveyors** [1] - 35:1
**surveys** [5] - 6:13, 29:4, 32:7, 34:4, 39:4
**survived** [1] - 59:23
**survivors** [1] - 52:23
**Susie** [1] - 32:19

**T**

**Taihu** [1] - 17:21
**tampered** [1] - 56:21
**taught** [2] - 12:9, 13:10
**tax** [1] - 22:8
**taxes** [6] - 21:13, 33:4, 33:8, 33:17, 35:21, 36:1
**teach** [1] - 49:24
**teacher** [1] - 52:11
**terrible** [1] - 58:18
**tertii** [3] - 28:18, 49:16, 52:9
**testimony** [1] - 29:7
**Texans** [1] - 15:8
**TEXAS** [3] - 1:1, 1:7, 1:5
**Texas** [20] - 1:15, 1:20, 1:23, 2:2, 2:4, 9:16, 18:5, 24:5, 27:7, 27:20, 34:17, 38:1, 48:19, 52:3, 52:13, 56:13, 56:15, 59:14, 61:3
**THE** [224] - 1:10, 1:14, 1:17, 3:2, 3:6, 3:9, 3:12, 3:18, 3:20, 3:24, 4:6, 4:13, 4:24, 5:9, 5:15, 5:22, 6:1, 6:4, 6:8, 6:15, 6:20, 6:23, 7:4, 7:15, 8:5, 8:12, 8:14, 8:23, 9:23, 10:5, 10:13, 10:16, 11:14, 11:17, 12:7, 12:9, 12:14, 12:18, 12:23, 13:2, 13:7, 13:14, 13:17, 15:2, 15:6, 15:10, 15:15, 15:17, 15:20, 15:23, 15:25, 16:9, 16:12, 16:15, 17:19, 18:2, 18:4, 18:8, 18:19, 18:23, 19:2, 19:7, 19:14, 19:16, 19:21, 19:25, 20:5, 20:8, 20:10, 20:13, 20:16, 20:22, 21:1, 21:5, 21:7, 21:11, 22:13, 23:7, 23:12, 23:25, 24:17, 24:20, 25:6, 25:14, 25:16, 25:22,

26:2, 26:6, 26:9, 26:15, 26:18, 27:9, 27:12, 27:15, 28:2, 28:4, 28:10, 28:15, 28:17, 28:21, 28:24, 29:3, 29:8, 29:12, 29:15, 29:17, 29:24, 30:8, 30:10, 30:14, 30:16, 30:23, 31:3, 31:20, 31:22, 31:25, 32:3, 32:11, 32:15, 32:25, 33:4, 33:7, 33:13, 33:18, 33:21, 34:3, 34:6, 34:11, 34:13, 34:16, 34:23, 35:4, 35:10, 35:19, 36:3, 36:10, 36:14, 36:18, 36:24, 37:2, 37:5, 37:11, 37:20, 37:24, 38:4, 38:24, 39:7, 39:13, 39:21, 40:2, 40:5, 40:8, 40:15, 41:1, 41:16, 41:19, 41:23, 42:1, 42:9, 42:13, 42:17, 42:19, 43:14, 43:21, 43:25, 44:4, 45:5, 45:9, 45:12, 45:18, 45:25, 46:9, 46:14, 46:22, 47:2, 47:4, 47:7, 47:14, 47:16, 49:11, 49:15, 49:23, 50:8, 50:11, 50:18, 50:21, 50:23, 51:2, 51:6, 51:14, 51:19, 51:25, 52:5, 52:9, 52:11, 52:18, 52:22, 53:15, 53:23, 54:2, 54:7, 54:14, 54:18, 54:25, 55:4, 55:6, 55:16, 55:19, 55:22, 55:24, 56:2, 56:12, 56:15, 56:22, 57:7, 57:19, 57:24, 58:1, 58:4, 58:13, 59:11, 59:13, 59:18, 60:5

**theirself** [1] - 14:18
**themselves** [1] - 38:9
**therefore** [1] - 27:20
**they've** [6] - 21:9, 31:14, 34:6, 41:10, 49:11
**thinks** [1] - 34:17
**third** [8] - 8:21, 22:20, 32:18, 33:18, 39:7, 50:2, 51:8, 59:15
**third-year** [1] - 50:2
**Thomas** [8] - 8:7, 10:6, 10:9, 10:14, 11:18, 39:23, 40:5
**thousand** [1] - 6:10
**threatened** [1] - 57:20
**three** [5] - 6:13, 23:25, 42:22, 43:3, 44:11
**thrive** [1] - 16:2
**Throckmorton** [1] - 56:1
**throughout** [1] - 26:13
**thud** [1] - 58:7
**Tibbets** [1] - 1:19
**title** [76] - 9:2, 9:3, 9:13, 9:21, 10:12, 11:25, 12:1, 12:5, 12:12, 12:17, 13:20, 14:15, 14:23, 14:24, 14:25, 15:5, 15:7, 16:1, 18:5, 18:22, 19:5, 19:10, 19:12, 20:20, 20:23, 20:24, 21:2, 23:2, 23:9, 23:11, 23:13, 24:10, 24:13, 24:21, 24:22, 24:24, 25:2, 25:3, 25:20, 27:4, 27:6, 27:7, 27:25, 28:22, 30:20, 31:20, 31:22, 33:23, 34:16, 34:18, 35:23, 36:11, 36:16, 37:8, 40:23, 40:24, 40:25, 41:4, 41:6, 41:7, 44:24, 48:6, 48:14, 48:16, 48:23, 49:16, 49:18, 53:8, 53:25, 54:4, 54:6, 54:21
**today** [9] - 4:16, 11:7, 11:24, 20:21, 48:10, 49:10, 51:11, 54:12, 54:24
**TONI** [1] - 1:14
**Toni** [1] - 1:14

**took** [4] - 4:8, 11:9, 27:3, 31:11
**top** [1] - 8:6
**total** [2] - 9:7, 11:6
**touching** [1] - 56:24
**tourists** [1] - 44:17
**towards** [1] - 20:1
**town** [1] - 5:1
**trace** [1] - 30:16
**tract** [21] - 5:6, 5:7, 5:12, 5:13, 5:20, 5:22, 5:23, 5:25, 6:1, 6:7, 6:11, 8:21, 9:15, 10:1, 12:1, 41:18, 42:14, 48:7, 54:15
**Tractor** [1] - 17:22
**tracts** [2] - 7:5, 8:17
**traded** [1] - 56:16
**TRANSCRIPT** [1] - 1:9
**transcript** [5] - 1:25, 14:2, 30:5, 39:13, 61:3
**transfer** [4] - 24:1, 25:17, 25:18, 27:6
**translated** [1] - 25:21
**trapezoid** [3] - 6:20, 6:21, 6:22
**TRAVIS** [1] - 1:18
**treaty** [1] - 56:18
**trees** [2] - 26:17, 55:9
**trespass** [17] - 9:13, 11:25, 12:4, 12:12, 14:23, 14:25, 15:4, 15:7, 19:10, 19:12, 22:24, 23:2, 23:8, 23:11, 27:7, 40:23, 54:5
**trial** [15] - 3:17, 4:11, 14:2, 14:3, 17:11, 29:20, 37:9, 38:23, 43:7, 46:4, 46:7, 49:24, 50:3, 58:16
**tributary** [2] - 6:8, 39:1
**tried** [15] - 7:21, 12:5, 14:23, 15:13, 15:14, 15:17, 15:21, 15:22, 19:11, 19:12, 19:13, 19:19, 23:10, 53:20
**triggered** [1] - 14:15
**true** [4] - 14:24, 18:7, 18:9, 61:3
**trust** [1] - 20:22
**try** [19] - 9:13, 11:25, 12:5, 12:12, 14:23, 14:25, 15:5, 15:7, 15:25, 19:10, 19:12, 23:2, 23:8, 23:11, 27:7, 40:24, 54:5, 58:19
**trying** [8] - 12:24, 13:4, 19:11, 31:5, 42:6, 45:19, 57:14
**turned** [1] - 58:11
**turning** [1] - 20:17
**turns** [1] - 31:10
**Twenties** [1] - 44:16
**twice** [1] - 35:2
**two** [9] - 3:13, 14:3, 32:7, 42:15, 44:7, 44:23, 48:2, 50:9, 57:21
**two-week** [1] - 14:3
**typescript** [1] - 4:2
**typewriters** [1] - 4:4
**typing** [2] - 29:4, 29:20

## U

**U.S** [3] - 55:25, 56:5, 56:20
**uncertain** [1] - 40:6

**under** [14] - 7:12, 12:17, 14:7, 15:4, 28:7, 31:18, 38:1, 39:22, 39:23, 40:25, 46:8, 51:12, 52:15, 53:9
**underlying** [1] - 17:25
**undisputedly** [2] - 51:16, 51:17
**undo** [1] - 16:25
**UNITED** [2] - 1:1, 1:10
**United** [9] - 2:2, 9:18, 16:17, 18:14, 48:19, 55:23, 55:25, 61:2
**unless** [1] - 56:25
**up** [25] - 6:8, 6:10, 10:16, 10:17, 12:19, 13:8, 13:9, 13:11, 13:14, 14:5, 21:12, 24:25, 32:14, 34:20, 35:5, 39:15, 45:3, 45:23, 48:3, 49:25, 50:7, 52:2, 55:19, 59:22
**upheld** [2] - 43:3, 43:4
**upside** [1] - 39:24
**useless** [2] - 22:7, 56:17
**usurped** [2] - 14:20, 57:5

## V

**vacate** [12] - 7:21, 18:11, 18:16, 18:19, 27:1, 27:21, 27:23, 49:4, 51:11, 51:13, 53:10, 54:24
**vacated** [2] - 54:9, 54:10
**vacating** [2] - 54:25, 55:1
**vacatur** [5] - 11:8, 15:14, 19:13, 19:18, 53:11
**valuable** [1] - 21:19
**value** [2] - 27:2, 27:3
**Vernon** [1] - 25:11
**version** [1] - 22:22
**versus** [7] - 18:14, 37:9, 37:12, 37:19, 42:9, 53:4, 56:1
**vertical** [1] - 5:17
**vertically** [1] - 10:6
**via** [1] - 1:25
**victorious** [1] - 41:24
**vigorously** [1] - 48:18
**void** [4] - 17:5, 17:15, 17:22, 28:12
**VS** [1] - 1:5

## W

**wait** [19] - 16:12, 18:19, 28:15, 29:24, 30:14, 30:23, 31:3, 32:15, 32:23, 36:3, 45:5, 45:18, 48:25
**Walker** [1] - 59:16
**Waller** [1] - 13:4
**war** [1] - 29:11
**warrantless** [1] - 14:19
**warranty** [8] - 53:22, 53:23, 53:24, 54:1, 54:2, 54:3
**water** [3] - 5:1, 46:7, 59:25
**ways** [1] - 46:16
**website** [2] - 34:21, 34:23
**week** [1] - 14:3
**Weimar** [2] - 4:16, 20:1
**welcome** [1] - 37:5

**West** [1] - 1:19
**west** [7] - 4:18, 7:11, 39:16, 39:25, 40:14, 44:22, 46:1
**western** [1] - 42:4
**whacks** [1] - 11:18
**whisper** [1] - 51:6
**whole** [4] - 3:9, 18:15, 33:19, 50:14
**wide** [1] - 45:25
**widen** [1] - 44:18
**widow** [2] - 25:6, 59:23
**width** [1] - 44:21
**wife** [3] - 21:12, 47:24, 58:13
**wife's** [2] - 23:19, 59:21
**Willie** [2] - 26:11, 26:12
**win** [3] - 18:22, 54:5, 59:4
**winners** [2] - 20:23, 20:25
**winning** [1] - 50:7
**witness** [5] - 14:8, 30:13, 32:16, 34:2, 58:10
**won** [4] - 15:3, 18:20, 50:11, 58:16
**wondered** [1] - 46:14
**Woodlands** [2] - 59:9, 59:10
**word** [4] - 10:6, 28:5, 51:23, 52:8
**words** [2] - 11:5, 23:5
**world** [1] - 50:6
**Worth** [1] - 14:1
**writ** [1] - 9:19
**write** [2] - 57:24, 58:1
**writing** [1] - 55:13
**written** [1] - 35:1
**wrote** [1] - 13:4
**Wuxi** [1] - 17:21

## Y

**y'all** [2] - 3:3, 3:15
**year** [3] - 23:6, 33:5, 50:2
**years** [9] - 7:14, 17:9, 33:10, 33:17, 49:2, 49:5, 55:11, 57:16, 59:23
**yellow** [1] - 8:3
**yeses** [1] - 33:13
**young** [2] - 31:16, 45:20
**younger** [2] - 13:8, 44:7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES K. COLLINS, M.D. | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. H-20-1897 |
| | § | |
| D. R. HORTON-TEXAS, LTD. | § | |
| Defendant. | § | |

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF MONTGOMERY | § |

<u>POST-HEARING AFFIDAVIT OF JAMES COLLINS</u>

Before me, the undersigned notary, on this day personally appeared James Collins, a person whose identity is known to me.   After I administered an oath to him, upon his oath, he said:

1.    "My name is James Collins.   I am capable of making this affidavit.   I am over the age of twenty-one (21) years and have never been convicted of a felony or crime of moral turpitude.   The facts stated in this affidavit are within my personal knowledge and are true and correct."

2.    Attached and incorporated are the following exhibits to this affidavit:

    Exhibit A1 -   Sieberman Title Run Sheet by Certified Professional Landman, Jay Costa.

    Exhibit A2 -   MCAD Feb. 2016 v. Feb. 2021 Sieberman Survey Satellite Screenshots

    Exhibit A3 -   Developer HORTON's Fosters Ridge Section 7 admitting Sieberman Survey Exists to Gov't by certified subdivision survey applications and plats submitted to City of Conroe Planning Commission dated Sept. 15, 2016, March 2016 and September 2016.

    Exhibit A4 -   Developer HORTON's Fraud to Hide Sieberman References in Gov't Records by submission September 15, 2016 where they had denoted their subdivisions included the Sieberman Survey, A-497 land; but, then tried to erase "Sieberman" by replacing with David Thomas, *A-497* (HORTON's Fosters Ridge development does not and cannot include the David Thomas, A-550, as they have no claim to the David Thomas, A-

550.   Note:   The David Thomas abtract number is A-550 not A-497. HORTON failed to change the abstract number from the Sieberman's A-497 to the David Thomas A-550.   This shows HORTON intentionally went into the filed government records and tried to change the record but they mistakenly left "A-497".   Again, they had no claim to the David Thomas Survey nor was the David Thomas Survey ever available to be made a part of a new subdivision.   HORTON committed fraud.

Exhibit A5 -   GLO Vesting Deeds/Grants into James and Archibald Hodge with Adjoinder Survey Analysis showing 1944 Boyles Survey was Wrong to Usurp Sieberman Survey into James Hodge Survey.

3.   SIEBERMAN TITLE RUN SHEET AND ABSTRACT OF TITLE.   Exhibit A1 is the title run sheet I ordered to show title from the sovereign into me of the Seiberman.   I ordered an abstract of title today to show a condensed history of the title into me that I will file with the court in two weeks when the certified professional landman obtains certified copies of the instruments for it composition.

4.   MY SIEBERMAN OWNERSHIP.   I own title to the Seiberman Survey as a successor in interest to the Seiberman Survey owners from the sovereign from Special Warranty Deeds and Quitclaim Deeds. See Exhibit A1 pp. 12, 16, 17.

5.   NO JOINDER.   I have personal knowledge after thorough review of the court records that no Sieberman Survey title owners were ever joined nor noticed in the Southern District of Texas lawsuit Cause No. 666; and, that HORTON does not dispute that no Sieberman Survey owners were ever joined or noticed of such suit or judgment.

6.   KNOWLEDGE OF 1944 JUDGMENT.   I first learned of the existence of the 1944 judgment on or near 2016 when HORTON sued me for quiet title.   The 1944 judgment filed as a muniment of title in the Montgomery County property records, and never submitted to the GLO, does not make any reference to the Sieberman Survey nor the Sieberman Survey owners.   No deeds, surveys or documents related to the purchase of my homestead in the David Thomas Survey, A-550, make any apparent reference to the Seiberman Survey or 1944 judgment.

7.   NO OCCUPATION OF SIEBERMAN SURVEY LAND EXCEPT BY ME.   The Sieberman Survey land related to this lawsuit was never occupied and was always thickly forested land except for the portion I used near my home.   In 2016, during the pendency of the Seiberman title lawsuit between HORTON and me, HORTON razed the forest and built homes.   See attached Exhibit A2 (Montgomery County Appraisal District (MCAD) Screenshot Feb. 2016 and MCAD Screenshot Feb. 2021).

8.   HORTON ADMITS SIEBERMAN SURVEY EXISTS IN 2015 AND 2016 THEN COMMITS FRAUD TO CONCEAL HORTON'S ADMISSION.   See Horton's subdivision survey plat and application to the government for approval of their subdivisions.   Their surveyors, EHRA, properly go to the GLO Sieberman patent as required by the local ordinances and identify the monuments of the Sieberman Survey, A-

497, in HORTON's subdivision survey plats and records.   See Exhibits A3 and A4.

9.    HORTON'S <u>ONLY</u> BASIS FOR TITLE TO COLLINS' SIEBERMAN LAND IS THE 1944 FEDERAL JUDGMENT THAT, AS I UNDERSTAND, IS VOID IN THE ABSENCE OF JOINDER OF THE SIEBERMAN OWNERS.   THE STATE COURT GRANTED HORTON'S SUMMARY JUDGMENT ON <u>ONLY</u> HORTON'S QUIET TITLE CLAIM THAT THE GLO'S SIEBERMAN SURVEY DID NOT EXIST, to-wit:

"It is further ORDERED that Defendants [COLLINS] *take nothing on their claims related in any manner to the Frederick Sieberman Survey A-497*, Montgomery Couny, Texas." Order granting HORTON's motion for summary judgment on Quiet Title, Nov. 8, 2016.

10.    TRESPASS TO TRY TITLE NEVER TRIED BY STATE COURT.   I filed a trespass to try title suit in 2016 to the state court in Montgomery County, Texas. However, because the court granted HORTON's summary judgment on HORTON's quiet title claim, the state court mandated that COLLINS could not try its trespass to try title and included such mandate in the order on summary judgment above.   I have knowledge that the state court not only did not try the trespass to try title claim (as expressly stated in the state appellate opinion):

"The problem with the Collinses' arguments under these issues is that they are challenging the proof concerning trespass to try title, a cause of action that D.R. Horton did not plead **and was not tried** and therefore was not at issue in this case." *Collins v. D.R. Horton-Texas Ltd.*, 574 S.W.3d 39, 46 (Tex. App.-Houston [14th Dist.] 2017, pet. denied), *emphasis added.*

In fact, the state court forbid that I mention the word "Sieberman," and HORTON was granted that all the official and current GLO certified maps used at trial redact the word "Sieberman," to prevent a trial on the merits on my trespass to try title claim.   HORTON filed ONLY a quiet title claim because HORTON could not succeed on a trespass to try title claim (*i.e.*, the only method for determing title in Texas) without any elements to determine title under the trespass to try title claim.   HORTON lied in the Feb. 3, 2021 hearing when its attorney, Paul McConnell, asserted that the state court tried the trespass to try title claim on its merits.   To the contrary, I was reprimanded and threatened with sanctions by the state trial court during trial for trying to even say the word "Sieberman" to explain my ownership.

11.    JAMES HODGE SURVEY VESTING DEED OF 1831 GRANTS <u>ONLY 4000 VARAS IN LENGTH FOR ITS WESTERN BORDER</u> AND THAT BORDER EXACTLY ADJOINS THE ARCHIBALD HODGE SURVEY'S 4000 VARAS EASTERN BORDER--WITH BOTH MEETING AT A MONUMENT ON THE SIEBERMAN SURVEY'S NORTHERN BORDER. THE GLO PATENT LAND SURVEYS CORRECTLY REFLECT THE ADJOINDERS AND COMPORT WITH THE VESTING DEEDS. SURVEYOR BOYLES INCORRECTLY CREDITED <u>4360 VARAS TO THE JAMES HODGE WESTERN BOUNDARY LENGTH</u> AND ENLARGED THE JAMES HODGE

Finally, I learned that Montgomery County Surveyor John Marshall Wade surveyed the land allotted to Frederick Siebermann from May 1, 1866 through May 4, 1866 on foot making specific field notes that are in the GLO file and online. To ensure no conflict existed between the adjacent surveys, Montgomery County Special Deputy Surveyor, Sam G. Clepper, re-traced the Sieberman Survey by following Mr. Wade's exact footsteps to locate on the ground the boundary corners on foot established by the original survey, with field notes on May 29, 1878. Mr. Clepper found "no-conflict" and the original survey to be correct per the GLO land records. (A5.07 pp. 4-10). I have learned that the heirs and successors in interest made public claim to their ownership of the Sieberman land in 1942 and 1943 (A5.01 pp. 9-10) but the Hodge owners never contacted, noticed or joined them in the very suit where the Hodge owners surreptitiously "moved their boundaries" to convert the Sieberman land, then sat back and did nothing actively to alert the Sieberman owners of their fraud (actual possession was never taken) and few transactions occurred until HORTON and Collins commenced acquiring land in 2012 and 2015.

For all of these reasons, it is my opinion that the Boyle's survey could not be in any way accurate and reliable, but the certified GLO patent records and survey from the sovereign are. My research showed that the southern border of the Archibald and James Hodge surveys were the same as per the co-existing monument provided for in both vesting documents. Since a) both land grants shared a mutual monument, the southern border of of the James Hodge could not extend south of the Archibald Hodge survey or else the Archibald Hodge would not close; b) the GLO records are in lock-step with the certified vesting documents; c) the acreage calls corroborate with the GLO grants/surveys; d) the totality of the Montgomery County survey parcels adjoin properly with the GLO documents. Thus, no doubt exists that the GLO patent files were and still are the accurate state land survey records upon which to rely. It is no wonder that the GLO is the basis for all Texas land grants, and should have been used by Surveyor Boyles (not some "recent survey" that increased the original land grant significantly). The gross increase in amount of acreage contained in the James Hodge "recent survey" (*i.e.,* from the one league land grant to over 1322 acres more) ALONE should have raised significant suspicison as to the accuracy of Boyle's survey. However, those who would oppose such an increase, *i.e.,* the Sieberman heirs, were not joined nor asked to defend their claim and reveal the inaccuracies of Boyle's survey. The GLO Sieberman Survey patent as identified today is a valid and existing land survey. If the court desires, I will obtain a proper survey for resolution of the matter.

James Collins

Subscribed and sworn to before me by James Collins on this the 5th day of Feb., 2021.

(SEAL)

Trey Chesten Sharretts

Notary Public in and for the State of Texas

TREY CHRISTEN SHARRETTS
Notary Public, State of Texas
Comm. Expires 09-26-2023
Notary ID 132189521